**LISZKA & GRAY, LLC**
Zachary J. Liszka, Esq. (ZL8359)
Sam Gray, Esq.
Carl J. Mayer, Esq., *of Counsel*
1180 Avenue of the Americas, Suite 800
New York, New York 10036
347-762-5131
zachliszka@gmail.com
*Attorneys for Plaintiff and the Putative*
*FLSA Collective and New York Class*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

MELISSA WOLFE, on behalf of herself and all others
similarly situated,

                      Plaintiff,

    -against-

FLYWHEEL SPORTS, INC.,
                Defendant.

----------------------------------------------------------------X

Case No:

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

       Plaintiff **Melissa Wolfe** (herein "Ms. Wolfe" or "Plaintiff"), on behalf of herself and

a class of all others similarly situated, by and through her attorneys, Liszka & Gray, LLC, as

and for the Complaint in this action against Defendant **Flywheel Sports, Inc**. (herein

"Flywheel" or "Defendant"), hereby alleges upon personal knowledge as to some, and

information and belief as to the rest, as follows:

**PRELIMINARY STATEMENT**

1.      Defendant operates instructor-led indoor cycling gyms in locations throughout many

major cities, including Atlanta, Boston, Chicago, Miami, Hollywood, Charlotte,

Philadelphia, Washington, D.C., Dubai, and New York City.

2.      Defendant's success rests upon its instructors, who are required to spend multiple hours before class designing each class routine within the specific parameters set by Defendant, according to the proprietary "Flywheel Method".

3.      However, Defendant welcomes its new instructors into the "FlyFam" by bilking them for approximately 12 weeks of free labor.

4.       For the first approximately 12 weeks of their employment, Defendant fails to pay *any* wages to its new instructors for the hours Defendant requires instructors spend, including, but not limited to, teaching classes to customers, canvasing the street promoting Defendant's brand, demonstrating Defendant's bicycles in store windows, answering potential customer questions, selling Defendant's products to customers, designing new routines, compiling music for classes, and attending training sessions, all according to the proprietary "Flywheel Method", in addition to requiring new instructors to purchase athletic uniforms and music from ITunes, all without compensation.

5.      After the first 12 weeks or so of work, Defendant thereafter only compensates its instructors according to a per class compensation scheme, at a minimum of $75 per class piece-rate basis, regardless of the length of time Defendant requires its instructors spend performing other various tasks, including, but not limited to, opening/unlocking the studio, setting up the computer systems, answering phones, checking in clients at the front desk, preparing for class, developing new routines, compiling playlists, communicating with customers, attending meetings, and engaging in marketing efforts on behalf of the company, and regardless of the business expenses Defendant requires their instructors to incur, including weekly Itunes music purchases, and athletic uniforms, all according to the "Flywheel Method".

6.      In fact, in an article published in Cosmopolitan entitled *12 Things I Wish I Knew Before I Became a Spin Instructor*, Kate Hickl, Defendant's Spin Instructor and the Director of Recruiting, Training & Talent Development says the following:

> At Flywheel…it takes twice as much time to plan a class than the class itself. For every hour I'm in class, I'm spending at least two hours prepping, putting together the playlist, and figuring out the sequencing. There are people who take my class four or five times a week, so I have to keep it fresh for them. When I'm not teaching, I also spend time marketing my classes on social media. At Flywheel, instructors just starting out get paid per class — which means you're not getting paid for your prep time — but as you gain more experience, there are opportunities to become full-time…. I have to pack for each day of work like I'm going on vacation: four sets of shirts, pants, socks, sports bras, bandanas, headbands, and so on. The amount of laundry you'll do is shocking. To offset the cost of the fitness wardrobe, some instructors will work as "brand ambassadors" for fitness retailers and get discounts as well as free products to wear in exchange for promotion.[1]

7.      As a result of Defendant's per class compensation scheme, (i) Defendant fails to pay its instructors the applicable minimum wage rate for all hours Defendant requires its instructors to work, and (ii) fails to pay its instructors at the proper piece-rate overtime rate for each week they work.

8.      For Plaintiff Melissa Wolfe, Defendant's wage and hour violations were compounded by the fact that Defendant condoned a culture of sexual harassment by Defendant's Master Instructor, Jesse Alexander, who worked for Defendant for five years.

9.      Alexander groped Ms. Wolfe on a weekly, sometimes daily basis in the workplace. In addition, Alexander made frequent and unwelcome sexual advances toward her in and out of the workplace, such as, "You should always ride without your shirt on. It's sexier." In fact, for a period of time, putting his hands on Ms. Wolfe's buttocks became Alexander's way of greeting her each time they interacted at work.

---

[1] http://www.cosmopolitan.com/career/a60972/spin-class-instructor-career/

10.     In addition, Ms. Wolfe was discriminated against and ridiculed when she requested

two classes off per week for three weeks to undergo radiation treatment for breast cancer.

For example, in a meeting that was supposed to be about her request for time off, CEO of

Flywheel, Jay Galluzzo and co-Founder Zukerman took turns mocking Ms. Wolfe's request

by doing impressions of other instructors who had requested time off in high-pitched, crying

tones, such as, "I'm Holly Rilinger and I'm leaving town tomorrow for Nike so cover my

classes! My name is Kate Hickl, I'm a diva and I refuse to teach at studios where the sound

system makes me strain my vocal cords."

11.     When Ms. Wolfe complained about the sexual harassment and discrimination to her

superiors, they failed to effectively remediate the situation. In some cases, her superiors

even made Ms. Wolfe's situation worse, or ignored, mocked, or retaliated against her for

reporting. Such instances included, but are not limited to the following:

   a.  Placing menacing phone calls and texts from Plaintiff's harasser, Jesse Alexander,
       immediately after making a report of sexual harassment against him.

   b.  Scheduling Plaintiff one class per week immediately after making a report of sexual
       harassment, while others were scheduled multiple times per week, which affected
       Plaintiff's compensation as she was paid strictly on a per class basis.

   c.  Scheduling Plaintiff's classes right before or right after her harasser, Alexander,
       which allowed him an opportunity to further retaliate by bad-mouthing her and her
       classes to customers, and harass her in passing.

   d.  Refusing to schedule Plaintiff for more classes, despite offering other instructors
       additional classes.

   e.  Issuing Plaintiff a sham 2013 performance review.

   f.  Threatening to terminate Plaintiff if she did not assent to continue to be scheduled
       for classes immediately before or after her harasser, Alexander.

   g.  Scheduling Plaintiff seven days per week, every week for several months without a
       day off, including the first morning shift, and the last evening shift three to four
       times per week, after reporting Alexander's harassing conduct and Devine-Baum's
       retaliatory conduct to Flywheel co-Founder Ruth Zukerman.

h.  Removing Plaintiff from her schedule after reporting Alexander's and Devine-Baum's retaliatory conduct to Human Resources.

i.  Denying her multiple requests for time off, including one day per week off, during a grueling seven-day-per-week schedule that spanned several months without a day off, while other instructors regularly were granted time off.

j.  Revealing medical information disclosed in private to obtain leave to other employees who had no legitimate business need for such information.

k.  Ridiculing and mocking Plaintiff for requesting leave to care for her breast cancer, and insisting that she share her personal medical information with the public.

l.  Removing Plaintiff again from her schedule shortly after requesting time off to care for her breast cancer.

m.  Terminating Plaintiff.

12.     Ms. Wolfe brings this action on behalf of herself and all similarly situated current and former instructors, who elect to opt-in to this action pursuant to the FLSA, 29 U.S.C. §§ 201 *et seq.,* specifically the collective action provision of 29 U.S.C. § 216(b), to remedy violations of the wage-and-hour provisions of the FLSA by Defendant that have deprived Ms. Wolfe and others similarly situated of their lawfully earned wages and overtime. Ms. Wolfe seeks permission to give notice of this action pursuant to 29 U.S.C. § 216(b) to all persons who worked as instructors for Defendant at any time from three years immediately preceding this action.

13.     Ms. Wolfe also brings this action on behalf of herself and all similarly situated current and former instructors pursuant to the Federal Rule of Civil Procedure 23 to remedy violations of NYLL Article 6 §§ 190 *et seq.*, and Article 19 §§ 650 *et seq.*, and the supporting New York State Department of Labor regulations.

14.     Ms. Wolfe also brings this action on behalf of herself to remedy discrimination and retaliation in the terms, conditions, and privileges of Ms. Wolfe's employment on the basis

of her sex and disability in violation of the New York State Human Rights Law, New York

State Executive Law § 296(1)(a) ("NYSHRL")

15.    Ms. Wolfe also brings this action on behalf of herself to remedy discrimination and

retaliation in the terms, conditions, and privileges of Ms. Wolfe's employment on the basis

of sex and disability in violation of  §8-107 of the New York City Human Rights Law, as

amended by the Restoration Act ("NYCHRL").

16.    Ms. Wolfe also brings this action on behalf of herself to correct unlawful

employment practices on the basis of Ms. Wolfe's disability and medical leave status, in

violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.,* ("FMLA").

## JURISDICTION AND VENUE

17.    Jurisdiction of the Court over this controversy is based upon 29 U.S.C. § 201, *et seq.*,

28 U.S.C. §§ 1331 and 1337 and the doctrine of supplemental jurisdiction pursuant to 28

U.S.C. § 1367.

18.    This Court has jurisdiction over all state law claims brought in this action pursuant to

28 U.S.C. § 1367.

19.    At all times relevant, Defendant Flywheel Sports, Inc. is and has been a duly

registered foreign business corporation incorporated in Delaware, with its principal office at

53 West 23rd Street, 9th Floor, New York, NY, 10010.

20.    All or a substantial part of the events or omissions giving rise to the claims herein,

including all of the work Ms. Wolfe and the similarly situated current and former instructors

performed and Defendant's failure to pay Ms. Wolfe and the similarly situated current and

former instructors for all hours worked, occurred in New York County, State of New York

and within the Judicial District for the Southern District of New York.

21.     Accordingly, this action properly lies in the Southern District of New York, pursuant to 28 U.S.C. § 1391.

## PARTIES

**Plaintiff Melissa Wolfe**

22.     Plaintiff Melissa Wolfe is a natural person who has resided in New York County during the relevant time period.

23.     Ms. Wolfe was employed by Defendant Flywheel Sports, Inc. in New York City as a spin class instructor, from July 24, 2013 until her involuntary termination on July 29, 2016.

24.     At all times relevant, Ms. Wolfe was an "employee" within the meaning of the NYSHRL, NYCHRL, FLSA, FMLA and NYLL.

25.     Ms. Wolfe has expressed her consent to make these claims against the Defendant by filing a written consent form, pursuant to 29 U.S.C. § 216(b).  (*See* Exhibit A, annexed hereto).

**Defendant Flywheel Sports, Inc.**

26.     At all times hereinafter mentioned, the activities of Defendant Flywheel Sports, Inc. constituted an "enterprise" within the meaning of Section 3(r) & (s) of the FLSA, 29 U.S.C. § 203(r) & (s).

27.     At all times hereinafter mentioned, Defendant employed employees, including Ms. Wolfe herein, who regularly engaged in commerce or in the production of goods for commerce or in handling, selling or otherwise working on goods and materials which have moved in or been produced for commerce within the meaning of Section 3(b), (g), (i) and (j) of the FLSA, 29 U.S.C. § 203(b), (g), (i), (j), (r) & (s).

28.     Upon information and belief, Defendant's annual gross volume of business is not less than $500,000 within the meaning of 29 U.S.C. § 203(s)(A)(ii).

29.     At all relevant times, Defendant maintained control, oversight, and direction over Ms. Wolfe and similarly situated employees, including timekeeping, payroll, and other employment practices that applied to them.

30.     Defendant applied the same employment policies, practices, and procedures to all instructors employed by Defendant, including policies, practices, and procedures with respect to payment of wages, deductions, and wage notices and statements.

31.     Upon information and belief, Defendant was and still is a foreign limited liability corporation organized and existing pursuant to the laws of Delaware and authorized to do business pursuant to the laws of the State of New York.

32.     Upon information and belief, Defendant's headquarters and principal place of business was and still is 53 West 23rd Street, 9th Floor, New York, NY, 10010.

33.     Defendant was and still is engaged in the business of operating instructor-led indoor cycling gyms.

34.     Upon information and belief, at all times relevant, Defendant is and was an "employer" within the meaning of the NYSHRL, NYCHRL, FLSA, FMLA and NYLL.

35.     Upon information and belief, at all times relevant, Defendant maintains control, oversight, and direction over its operations and employment practices.

**FLSA COLLECTIVE ACTION CLAIMS**

36.     Upon information and belief, there are approximately more than 40 current and former instructors that are similarly situated to Plaintiff.

37.     Plaintiff brings the First Cause of Action, on behalf of herself and all similarly situated persons who have worked for Defendant as instructors and who elect to opt-in to this action.

38.     Plaintiff represents other instructors, and is acting on behalf of the interests of those

instructors, as well as her own interests in bringing this action.

39.     Plaintiff seeks to proceed as a collective action with regard to the First Cause of

Action, pursuant to 29 U.S.C. § 216(b) on behalf of herself and the following class of

persons:

> All instructors who were employed by Defendant any time during the
> 3 years prior to the filing of their respective consent forms
> (hereinafter referred to as the "Collective Period"), and who did not
> receive wages for all hours worked, including overtime wages
> (hereinafter, the "FLSA Collective").

40.     Defendant was aware or should have been aware that the law required them to pay

employees, including Plaintiff and the FLSA Collective, for all hours worked that Defendant

suffered or permitted them to work, including piece-rate overtime. Upon information and

belief, Defendant applied the same unlawful policies and practices to its instructors.

41.     The FLSA Collective is readily identifiable and locatable through use of the

Defendant's records.  The FLSA Collective should be notified of and allowed to opt-in to

this action, pursuant to 29 U.S.C. § 216(b).  Unless the Court promptly issues such a notice,

the FLSA Collective, who have been unlawfully deprived of their wages for all hours

worked in violation of the FLSA, will be unable to secure compensation to which they are

entitled, and which has been unlawfully withheld from them by Defendant.

## FEDERAL RULES OF CIVIL PROCEDURE RULE 23
## CLASS ALLEGATIONS

42.     Plaintiff sues on her own behalf and as the class representative (hereinafter, the

"New York Class Representative") and brings the Second and Third Causes of Action on

her own behalf and as a class action, on behalf of those similarly situated, pursuant to Rule

23, sections (a) and (b), of the Federal Rules of Civil Procedure (hereinafter, the "New York Class").  The sub-classes of the New York Class are defined as:

    a.     All instructors who were employed by Defendant, at any time within the 6 years prior to the filing of this Complaint through the entry of judgment in this matter, whom Defendant failed to pay for all hours worked, including overtime wages (hereinafter, the "NYLL Class").

    b.     All instructors who Defendant hired at any time from April 9, 2011 through the present, and who were not provided the proper wage notice pursuant to NYLL Section 195(1) (hereinafter, the "Wage Notice Class").

    c.     All instructors who Defendant employed at any time from April 9, 2011 through the present, and who were not provided the proper wage statement pursuant to NYLL Section 195(3) (hereinafter, the "Wage Statement Class").

43.    The persons in the New York Class are so numerous that joinder of all members is impracticable.  Although, the precise number of such persons is unknown, and facts upon which the calculation of that number are presently within the sole control of Defendant, there are approximately more than 40 members of the New York Class.

44.    There are questions of law and fact common to the New York Class that predominate over any questions solely affecting individual members of the New York Class, including but not limited to:

    a.     Whether Defendant unlawfully failed to pay wages for all hours worked, including overtime wages, in violation of and within the meaning of the NYLL Article 6, §190 *et seq.*, and the supporting New York State Department of Labor Regulations, 12 N.Y.C.R.R. § 142 *et seq.*;

    b.     Whether Defendant's policy of failing to pay instructors wages for all hours worked was instituted willfully or with reckless disregard of the law;

    c.     Whether Defendant unlawfully failed to provide accurate and timely wage notice, pursuant to N.Y. Lab. Law § 195(1);

    d.     Whether Defendant unlawfully failed to provide accurate wage statements, pursuant to N.Y. Lab. Law § 195(3);

e.     The proper measure of damages sustained by the New York Class Representative and the New York Class; and

f.     Whether Defendant should be enjoined from such violations in the future.

45.     The New York Class Representative fairly and adequately protects the interests of the New York Class and has no interests antagonistic to the class.  The Plaintiff is represented by attorneys who are experienced and competent in both class litigation and employment litigation.

46.     A class is superior to other available methods for the fair and efficient adjudication of the controversy, particularly in the context of wage-and-hour litigation where individual plaintiffs lack the financial resources to vigorously prosecute a lawsuit in federal court against a corporate defendant.  The damages sustained by individual class members are small, compared to the expense and burden of individual prosecution of this litigation.  Class action treatment will obviate unduly duplicative litigation and the possibility of inconsistent judgments.

47.     Further, the New York Class Representative and the New York Class have been equally affected by Defendant's failure to (1) pay wages for all hours worked, (2) provide accurate wage notices, and (3) provide accurate wage statements.  Moreover, members of the New York Class still employed by Defendant may be reluctant to raise individual claims for fear of retaliation.

48.     Defendant has acted or refused to act on grounds generally applicable to the New York Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class was a whole.

49.     Plaintiff's claims are typical of those of the class.  Plaintiff and the New York Class members were subjected to Defendant's policies, practices, programs, procedures, protocols

and plans alleged herein concerning the non-payment of wages, the failure to provide accurate wage notices and statements, and the failure to keep adequate records. The job duties of Plaintiff are typical of those of the class members.

50.     The New York Class Representative intends to send notice to all members of the New York Class to the extent required by Rule 23.

## CLASSWIDE FACTUAL ALLEGATIONS

51.     Plaintiff and the members of the FLSA Collective and New York Class (collectively "Class Members") are victims of Defendant's common policy and plan that violated their rights under the FLSA and NYLL by denying them wages for all hours worked, including overtime wages. At all times relevant, Defendant's unlawful policy and pattern or practice was willful.

52.     All of the work performed by Class Members was assigned by Defendant and/or Defendant was aware of all the work that Plaintiff and the Class Members performed.

53.     Upon information and belief, Defendant failed to pay each Class Member, including Plaintiff for all hours worked during an approximately 12-week "training" period, consisting of approximately 4-6 hours per week of on-site work, and 15 to 20 hours per week of off-site work.

54.     Upon information and belief, Defendant failed to pay each Class Member, including Plaintiff, for all hours worked during the approximately 12-week "training" period, including training conducted at Defendant's various locations, such as Defendant's Flatiron location; during Defendant's regular business hours, including many trainings at 9:30 a.m.; where Plaintiff and the Class Members understood that, as a policy of Defendant's, failure to attend the trainings meant Defendant would not schedule Plaintiff and the Class Members to teach classes; where the training was designed to make the Plaintiff and the Class Members

handle their job more effectively by training them in the proprietary "Flywheel Method",

which included instruction on designing routines, compiling playlists, and leading classes;

and where Defendant required they also perform productive work for Defendant during the

training period, including, but not limited to, promoting Defendant's classes on social

media, canvassing for Defendant, and demonstrating Flywheel bicycles in store windows.

55.     Upon information and belief, after the "training" period, Plaintiff and each Class

Member were/are paid on a per class, piece-rate basis. Generally, classes lasted 45-60

minutes, and Defendant paid Plaintiff and the Class Members regardless of length time

worked, but rather based upon class size, according to the following schedule:

| | |
|---|---|
| 1-14 attendees: | $75 per class |
| 15-28 attendees: | $100 per class |
| 29 or more attendees: | $150 per class |

56.     Upon information and belief, after the training period, Plaintiff and each Class

Member were/are required not only to teach classes, but also perform a variety of other

tasks, including, but not limited to opening/unlocking the studio, setting up the computer

systems, answering phones, checking in clients at the front desk, preparing for classes,

developing routines, compiling playlists, communicating with customers, attending

meetings, and engaging in marketing on behalf of the company.

57.     Upon information and belief, after the training period, Plaintiff and the Class

Members would spend/are spending approximately 15 to 28 hours per week on a variety of

other tasks, including, but not limited to opening/unlocking the studio, setting up the

computer systems, answering phones, checking in clients at the front desk, preparing for

classes, developing routines, compiling playlists, communicating with customers, attending

meetings, and engaging in marketing on behalf of the company, that were/are separate and distinct from the time spent teaching class.

58.     Upon information and belief, Defendants were/are aware that Plaintiff and the Class Members would spend/are spending approximately 15 to 28 hours per week on tasks that were/are separate and distinct from the time spent teaching class after the training period.

59.     Upon information and belief, the Class and Plaintiff was/is required to incur business expenses for items necessary to perform their job, including, but not limited to purchasing specific music and specific athletic attire that Defendant mandated they buy. The Class was never reimbursed for these expenses.

60.     As a result of Defendant's per class compensation scheme, for example, for weeks in which Defendant scheduled Plaintiff and Class Members to teach one 45 minute class per week with 14 attendees ($75 per class), and Plaintiff and the Class Members performed 15 hours of various other tasks Defendant required, such as opening/unlocking the studio, setting up the computer systems, answering phones, checking in clients at the front desk, preparing for classes, developing routines, compiling playlists, communicating with customers, attending meetings, and engaging in marketing on behalf of the company. This means that Defendant paid Plaintiff and the Class Members approximately $4.76 per hour.

61.     Further, as a result of Defendant's per class compensation scheme, for example, for weeks in which Defendant scheduled Plaintiff and Class Members 20 classes per week with 14 attendees each ($75 per class, four classes per day, five days per week), for a total of 15 hours of teaching class, and Plaintiff and the Class Members performed 28 hours of various other tasks Defendant required, such as opening/unlocking  the studio, setting up the computer systems, answering phones, checking in clients at the front desk, preparing for classes, developing routines, compiling playlists, communicating with customers, attending

meetings, and engaging in marketing on behalf of the company, Defendant paid Plaintiff and
the Class Members approximately $1,500 per week ($75 x 20 classes), but failed to pay for
the additional 3 hours of overtime at half the regular rate.

62.     As part of its regular business practice, Defendant intentionally, willfully, and
repeatedly engaged in a pattern, practice, and/or policy that violates the FLSA and
NYLL.  Defendants' policy and pattern or practice includes but is not limited to:

> a.      Willfully failing to keep accurate payroll records as required by the FLSA
> and NYLL;
>
> b.      Willfully failing to pay its employees, including Plaintiff and Class Members,
> wages for all hours worked, including overtime wages;
>
> c.      Failing to provide accurate wage notices and statements pursuant to N.Y.
> Lab. Law §§ 195(1) and (3).

63.     Defendant was or should have been aware that the FLSA and NYLL required
Defendant to pay Plaintiff and the Class Members for all hours worked, including overtime
wages.

64.     Defendant's failure to pay Plaintiff and the Class Members wages for all hours
worked, including overtime wages, was willful, intentional, and in bad faith.

65.     Defendant failed to provide Plaintiff and members of the Wage Notice Class with
accurate and proper wage notice pursuant to N.Y. Lab. Law § 195(1).

66.     Defendant failed to provide Plaintiff and members of the Wage Statement Class with
accurate wage statements pursuant to N.Y. Lab. Law § 195(3).

67.     Defendant's unlawful conduct has been widespread, repeated, and consistent.

## PLAINTIFF'S FACTUAL ALLEGATIONS

**FLSA and NYLL Violations**

68.     On July 24, 2013, Defendant e-mailed Ms. Wolfe to inform her she was hired as a spin class instructor.

69.     Before Ms. Wolfe could begin teaching classes, Defendant required Ms. Wolfe to attend training, including training on the "Flywheel Method", all of which spanned from approximately August 8 to October 25, 2013, all without compensation.

70.     Ms. Wolfe's training took place mostly at Defendant's Flatiron location, during regular business hours, including many trainings at 9:30 a.m.

71.     Ms. Wolfe came to understand that it was Defendant's policy that if she failed to attend any part of the training, Defendant would not schedule her to teach classes.

72.     Defendant required Ms. Wolfe to attend the trainings in order to make her more effective at her job, including, but not limited to, training her on how Defendant wanted her to design routines, compile playlists, and lead classes according to the "Flywheel Method".

73.     Between August 8 and October, 25, 2013--with the exception of a two-week period where Plaintiff did not work--Defendant failed to compensate Ms. Wolfe for hours Defendant required she spend attending approximately 50, one-hour "master class sessions", as part of her training.

74.     Between August 12 and August 29, 2013, Defendant failed to compensate Ms. Wolfe for hours Defendant required she spend attending approximately 30 hours worth of "training sessions", as part of her training.

75.     On September 5, September 12, and October 15, 2013, Defendant failed to compensate Ms. Wolfe for hours Defendant required she spend teaching "sneak peek" classes to Flywheel customers, each consisting of 45 minutes of class, and 30 minutes wherein Defendant critiqued Ms. Wolfe's class, as part of her training.

76.     Between August 8 and October 25, 2013, as part of the training, Defendant required Ms. Wolfe to perform various other tasks for Defendant without compensation, including, but not limited to (i) promoting Defendant's classes on social media; (ii) canvassing for Defendant; and (iii) demonstrating Flywheel bicycles in store windows, including being driven by Defendant's marketing director, Lara Kalayjian to Milburn, New York to demonstrate a Flywheel bicycle in a store window (Ms. Wolfe was also required by Defendant to purchase a Flywheel shirt to wear while riding the bicycle, but was never reimbursed), and later, Defendant required Ms. Wolfe to answer questions from potential customers, and sell Defendant's products to potential customers, which totaled approximately 15 to 20 hours.

77.     Between August 8 and October 25, 2013, Defendant failed to compensate Ms. Wolfe for hours Defendant required she spend designing routines, and downloading and compiling playlists, amounting to approximately 15 to 20 hours per week.

78.     Between August 8 and October 25, 2013, Defendant failed to compensate Ms. Wolfe for business expenses Defendant required she incur, including, but not limited to purchasing approximately 70 songs per week from Itunes at a cost of between .99 cents and $1.29 per song; and purchasing specific athletic uniforms, including 10 to 15 pairs of athletic pants at $50 to $100 per pair, 15 to 20 athletic shirts at $30 to $50 per shirt, 10 sports bras at $30 to $50 per bra.

79.     Defendant failed to issue Ms. Wolfe a hiring notice or wage statement until on or about October 10, 2013.

80.     Starting on or about October 27, 2013 until Ms. Wolfe's involuntary termination on July 29, 2016, Ms. Wolfe was not only required to teach class, but also perform a variety of others tasks including, but not limited to, opening/unlocking the studio, setting up the

computer systems, answering phones, checking in clients at the front desk, preparing for classes, developing routines, compiling playlists, communicating with customers, attending meetings, and engaging in marketing on behalf of the company.

81.     Starting on or about October 27, 2013 until Ms. Wolfe's involuntary termination on July 29, 2016, Defendant paid Ms. Wolfe strictly on a per class basis; that is, a flat rate for each class taught, regardless of the length of the class.

82.     Generally, classes lasted 45-60 minutes, and Defendant paid Ms. Wolfe regardless of length time worked, but rather based upon class size, according to the following schedule:

|  |  |
|---|---|
| 1-14 attendees: | $75 per class |
| 15-28 attendees: | $100 per class |
| 29 or more attendees: | $150 per class |

83.     Starting on or about October 27, 2013 until Ms. Wolfe's involuntary termination on July 29, 2016, Ms. Wolfe was required by Defendant to spend approximately 15 to 28 hours per week on various tasks, including, but not limited to, opening/unlocking the studio, setting up the computer systems, answering phones, checking in clients at the front desk, preparing for classes, developing routines, compiling playlists, communicating with customers, attending meetings, and engaging in marketing on behalf of the company.

84.     As a result, on typical weeks between October 27, 2013 and early February 2014, Defendant failed to pay the applicable minimum wage rate, where Ms. Wolfe was scheduled for one class per week, and was paid only $75, but Defendant required her to perform additional tasks outside of teaching class, including, but not limited to preparing for classes, developing routines, compiling playlists, communicating with customers, attending meetings, and engaging in marketing on behalf of the company, that amounted to 15 hours or more of work per week, and Defendant was aware of this fact.

18

85.     As a result, on typical weeks between late February 2014 until July 29, 2016, Defendant failed to pay the applicable overtime rate, where Ms. Wolfe was scheduled to teach classes for at least 26 hours per week, that, when combined with the various other tasks Defendant required, including, but not limited to preparing for classes, developing routines, compiling playlists, communicating with customers, attending meetings, and engaging in marketing on behalf of the company that amounted to at least 15 hours per week, and Defendant was aware of this fact.

86.     Upon information and belief, Defendant employs more than 15 employees; it is believed that it employs over 900 employees.

87.     Upon information and belief, Defendant grosses more than $500,000 per year; in fact, each of the 37 plus locations hold approximately 24 classes per day, with a capacity of 50 people per class, generating approximately $34 per person.

**NYCHRL, NYSHRL, and FMLA Violations**

88.     Flywheel Master Instructor Jesse Alexander ("Alexander") physically and verbally sexually harassed Ms. Wolfe on a weekly, sometimes daily basis.

89.      Alexander was assigned by Defendant to train Ms. Wolfe in her role as a spin class instructor; and was Ms. Wolfe's supervisor.

90.     Alexander sexually harassed Ms. Wolfe both in and outside of work.

91.     Alexander's sexual harassment of Ms. Wolfe included, but was not limited to, regular and unwelcome touching of her buttocks and lower back, unwelcome and sexually charged comments toward her, and unwelcome sexual advances made via text message.

92.     For example, during Ms. Wolfe's first encounter with Alexander in a cycling training session on August 11, 2013, Alexander walked to the front of Ms. Wolfe's bike, put his

hands on the front of her bike handlebar, leaned in to her face, and said, "That ass looks great in 3rd position."

93.     "Third position" is a Flywheel term of art that requires the cyclist to stand up on their bicycle and push their buttocks out.

94.     After the training session was over, Alexander pulled Ms. Wolfe aside and reprimanded her by saying, "You should always ride without your shirt on. It's sexier." He also said, "I don't know why you women are always so afraid to be sexy." And later, "Don't waste that body."

95.     Flywheel gave Ms. Wolfe's personal contact information to Alexander, and Alexander immediately used her contact information to further sexually harass Ms. Wolfe.

96.     For example, the very next week after her first training session with Alexander, he began texting Ms. Wolfe unwelcome sexual advances outside of work, including "Hey sexy" and "Sup sexy".

97.     On August 16, 2013, Ms. Wolfe had another training session with Alexander.

98.     While other new hires took turns leading the training session on August 16, Alexander sat on the cycle right next to Ms. Wolfe and made sexually suggestive comments about her appearance.

99.     After the training session on August 16, Alexander pulled Ms. Wolfe aside and again reprimanded her by saying, "I've got big plans for you. You're gonna work that body and get it. Nobody wants to see this white girl shit up there, sex it up and hook 'em. Get your shirt off.  Move! Shake your ass!"

100.    On August 18, 2013, Ms. Wolfe had another training session with Alexander.

101.    During the August 18 training session, Alexander told her, "'Oh! Yes! Take it off, Melis! Time to get sexy!"

102.    At one point during the August 18 training session, Alexander walked over to Ms. Wolfe's bicycle, stood over her, put one hand on her buttocks while she was in third position, and told her to "work it" and then placed his hand over hers on the bicycle handlebar.

103.     On August 19, 2013, Ms. Wolfe had another training session with Alexander.

104.    During the August 19 training session, Alexander told Ms. Wolfe he wanted her to "flaunt that ass on the podium" and to "keep it sexy."

105.    On August 29, 2013, Alexander required that Ms. Wolfe show him a playlist she had made for class.

106.    After listening, Alexander described the playlist Ms. Wolfe had made as "Garbage" and "Disney crap" and her told that she needed to be "more X-rated than G-rated."

107.    During this same instance on August 29, Alexander said to Ms. Wolfe, "You're a hot girl, people are coming for the sex appeal. If you want to build up your class, sports bra is the way to go."

108.    Starting in September 2013, Alexander increased the frequency of inappropriate texts to Ms. Wolfe.

109.    For example, Alexander sent Ms. Wolfe an unsolicited and derogatory text about what he thought of each female instructor, by name.

110.    Such text messages by Alexander included, "[she] used to be cool until she became a lesbian", and "[she] is a waste of time and a total bitch who should have never been hired".

111.    Alexander also mentioned that Ms. Wolfe should stay away from the male instructors that "play Disney shit".

112.    Alexander also indicated in his text messages to Ms. Wolfe that he maintained a close friendship and affinity for Danielle Devine-Baum, a Northeast Regional Director for

Flywheel who was responsible for setting the schedules for all instructors in New York City, including Ms. Wolfe.

113.    Starting in September 2013, Alexander began regularly greeting Ms. Wolfe with a hand on her buttock; and he would often approach Ms. Wolfe unannounced while she was studying in the employee lounge by putting his hands on her, including, squatting down behind her and rubbing her shoulders, or sitting down next to her and rubbing his body on her.

114.    Starting in September 2013, Alexander started regularly reprimanded Ms. Wolfe after class or during training by saying "Never ride with your shirt on", and that all she need to do to be good at her job was to "turn up the sex appeal."

**Ms. Wolfe Reports the Sexual Harassment by Alexander**

115.    In late September 2013, Ms. Wolfe attempted to set up a meeting with her direct manager, Kate Hickl to discuss Alexander's sexually harassing behavior toward her.

116.    However, Hickl said she was unable to meet with Ms. Wolfe until the first week in October 2013.

117.    Hickl arranged for the meeting to take place outside the office at a restaurant called Taralucci e Vino in Manhattan in the afternoon.

118.    During the meeting, Ms. Wolfe told Hickl that she was being pressured by Alexander to take off her shirt, that his constant physical touching was upsetting, and that she did not know what to do about his frequent and unwelcome sexual advances via text message.

119.    Ms. Wolfe also showed Hickl a text wherein Alexander had degraded female instructors, including derogatory comments about Hickl and her girlfriend.

120.    When Hickl read the text from Alexander regarding Hickl and her girlfriend, she immediately got up to make a phone call, returned and said, "I will take care of it" and abruptly ended the meeting.

**Ms. Wolfe is Retaliated Against For Reporting Sexual Harassment**

121.    Within an hour of reporting Alexander's sexually harassing conduct to Hickl, Ms. Wolfe received a call from Alexander, but she was too terrified to answer it.

122.    Ms. Wolfe let the call go to voicemail. Alexander left a menacing voicemail saying, "What a piece of shit! I couldn't be angrier with you! Who do you think you are!"

123.    On October 11, 2013, Ms. Wolfe received a text message from Hickl stating that she had notified and was apologizing on behalf of co-Founder Ruth Zukerman and then-CEO/co-Found Jay Galluzzo regarding Alexander's sexual harassment of Ms. Wolfe, and further, "that [Alexander] was toxic."

124.    On October 11, 2013, Alexander texted Ms. Wolfe, "The amount of time I wasted in trying to help you. Dude. What (sic) I monumental disappointing. Disappointment."

125.    Shortly after reporting Alexander's conduct, one of Alexander's close friends and co-worker, Danielle Devine-Baum, contacted Ms. Wolfe to set up a meeting on October 19, 2013.

126.    Although Ms. Wolfe and Devine-Baum had not maintained a relationship outside work, suddenly Devine-Baum wanted to meet with Ms. Wolfe, and told Ms. Wolfe the purpose of the meeting was to "to just hang outside of Fly for a bit and chat".

127.    Devine-Baum was Ms. Wolfe's supervisor, and, upon information and belief, had the ability to hire, fire, and discipline Flywheel employees.

128.    Aside from handling Ms. Wolfe's hiring paperwork and scheduling Ms. Wolfe for classes, Devine-Baum and Ms. Wolfe did not normally interact at work.

129.    Devine-Baum arranged for the meeting with Ms. Wolfe to take place at Coffee Bean & Tea Leaf in Manhattan.

130.    Although Ms. Wolfe had not told Devine-Baum that she reported Alexander for sexually harassing her, Devine-Baum started the meeting by insinuating that Ms. Wolfe had reported being sexually harassed by Alexander.

131.    Ms. Wolfe attempted to go through the many of the instances of sexual harassment by Alexander with Devine-Baum at the meeting, but Devine-Baum cut her off, saying "there's so much excitement during training, and it can be really stressful, so I understand that sometimes perception can get a little, you know, blurry. You should just try to relax and move on."

132.    After the meeting with Devine-Baum, Alexander's conduct toward Ms. Wolfe became more erratic and bizarre.

133.    For example, when passing Ms. Wolfe at work, Alexander would often mutter derogatory comments about Ms. Wolfe under his breath or roll his eyes at her.

134.    On October 24, 2013, Ms. Wolfe again reported Alexander's harassing conduct to Hickl in a text message. However, this text went unanswered.

135.    In late-October 2013, Ms. Wolfe received her first teaching schedule from Devine-Baum.

136.    While others in her training group had been assigned to teach multiple classes per week, Ms. Wolfe was distressed to learn that not only had Devine-Baum scheduled her to teach only one class per week, but that Devine-Baum had scheduled Ms. Wolfe to teach at a time either right before or right after Alexander's classes.

137.    For example, on October 27, 2013, Devine-Baum started scheduling Ms. Wolfe for the 7:30 a.m. class in Flywheel's Flatiron studio, and Alexander was scheduled for the very next class after Ms. Wolfe's class.

138.    As a result, each time she taught, Ms. Wolfe had to face her harasser, Alexander, in passing, who would mutter things under his breath to her, such as, "I can't fucking believe this".

139.    Further, Ms. Wolfe discovered that Alexander showing up to the Flywheel studio to sabotage Ms. Wolfe's class attendance by bad-mouthing her to other customers, which in turn, affected her compensation because class attendance determines how much Flywheel pays the instructor per class.

140.    For example, a week before Ms. Wolfe was scheduled to substitute for one of Alexander's classes, Ms. Wolfe overheard Alexander telling a customer at Flywheel, "don't waste your time. It's this one [motioning towards Ms. Wolfe]. Waste of fuckin' time."

141.    In late October 2013, Ms. Wolfe contacted Devine-Baum regarding the interactions with Alexander that Devine-Baum had brought upon Ms. Wolfe after they spoke about Alexander sexually harassing her.

142.    However, Devine-Baum was evasive and refused to meet with Ms. Wolfe in the workplace.

143.    Finally, on October 25, 2013, Devine-Baum said Ms. Wolfe could meet her outside of work at another gym called As One.

144.    Having no other choice, Ms. Wolfe attended the As One class to meet with Devine-Baum to discuss the retaliation she was facing as a result of reporting sexual harassment, including Devine-Baum's decision to schedule her immediately before or after Alexander's classes.

145.   However, Devine-Baum ignored Ms. Wolfe during the As One class, and had brought her husband along to the class, making it awkward for Ms. Wolfe to bring up the way Alexander was treating Ms. Wolfe in front of Devine-Baum's husband.

146.   Again, in early November 2013, Plaintiff Wolfe contacted Devine-Baum regarding the scheduling problems Devine-Baum had caused after they spoke about Alexander sexually harassing her.

147.   Devine-Baum evaded Plaintiff Wolfe's request for a meeting, so Plaintiff Wolfe approached her at the Flywheel studio in the Upper East Side to have an impromptu meeting.

148.   At the impromptu meeting, Ms. Wolfe explained to Devine-Baum that she felt extremely uncomfortable having her classes scheduled immediately before or after Alexander's because of his sexually harassing conduct, and that Alexander was sabotaging her class attendance by waiting around before her classes began to bad-mouth her to customers, which affected her compensation.

149.   Despite Ms. Wolfe's concerns, Devine-Baum refused to schedule Ms. Wolfe for other classes, even though other classes were available.

150.   Instead, Devine-Baum claimed ignorance regarding the sexually harassing conduct by Alexander, and told Ms. Wolfe, "You need to earn your client base by providing a good class, not by worrying about what Jesse [Alexander] was saying."

151.   Flywheel Front Desk Coordinator, Rhisa Parera, regularly witnessed Alexander bad-mouthing Ms. Wolfe outside of class to other customers, or making derogatory comments toward Ms. Wolfe.

152.   In a declaration executed July 29, 2016, and annexed hereto as Exhibit B and incorporated herein, Parera states the following:

> For example, in November 2013, at the Flatiron Flywheel studio, while working behind the front desk, I witnessed Alexander approaching the door to the class that Wolfe had just finished teaching, saying to two other female customers, " I don't know why these women would take this bitch's class," referring to Wolfe's class that was just ending.  I witnessed Alexander make this type of derogatory comment about Wolfe or Wolfe's class to others, or to Wolfe herself after nearly every class Wolfe taught, until he was terminated in July 2015.

153.    Shortly after contacting Devine-Baum regarding the scheduling issues in November 2013, Ms. Wolfe again contacted Hickl to ask her what she should do regarding Alexander's continued harassment and Devine-Baum's scheduling changes in retaliation for reporting sexual harassment.

154.    Hickl responded to Ms. Wolfe that she would speak with Ruth Zukerman, Co-Founder and Creative Director for Flywheel, and that "action had already been taken."

155.    In mid-November 2013, despite Devine-Baum scheduling each instructor of Ms. Wolfe's training group for multiple classes per week, and some receiving permanent schedules, Devine-Baum was scheduling Ms. Wolfe for only one class per week, even though additional classes were available and Ms. Wolfe was willing to instruct those classes.

156.    For example, during November 2013, one instructor from Ms. Wolfe's training group was being scheduled for 14 classes per week, which she informed Ms. Wolfe was too many for her to handle and she felt over-worked, as a result.

157.    In fact, Devine-Baum would send out weekly e-mails to the group of instructors informing them of available opportunities to teach class, and Ms. Wolfe replied to each saying that she was available to teach class.

158.    However, Ms. Wolfe was not scheduled for any additional classes by Devine-Baum.

159.    When Ms. Wolfe asked Devine-Baum why she was only being scheduled for one class per week, while her peers were regularly being scheduled for multiple classes per

week, Devine-Baum told Ms. Wolfe that she did not have any feedback for her, and that her performance was satisfactory.

160.    After pressing further, Devine-Baum said that Ms. Wolfe did not have enough experience using the microphone to lead her classes.

161.    Ms. Wolfe asked Devine-Baum how she was supposed to gain experience using the microphone if she was not being scheduled to teach classes.

162.    In response, Devine-Baum told Ms. Wolfe, "You need to wait."

163.    In December 2013, Ms. Wolfe approached Devine-Baum again to ask why she was still not being scheduled for as many classes as others in her training group.

164.    Devine-Baum said to Ms. Wolfe that there was no problem with her performance, and that "you are exactly where you need to be."

165.    Later that day, Ms. Wolfe inquired further of Devine-Baum as to why Devine-Baum was not scheduling her for classes.

166.    Devine-Baum called Ms. Wolfe back at around 8:30 p.m. and said, "It's best if you learn to keep your mouth shut. Just mind your own business."

167.    In mid-December 2013, Ms. Wolfe was given her first performance review.

168.    Ms. Wolfe's performance review was conducted by Devine-Baum and another Flywheel instructor, John Wellman.

169.    Ms. Wolfe was shocked to learn that after being told repeatedly that her performance was satisfactory over the course of her employment, and despite that Devine-Baum had no feedback for her to improve, and despite the fact that neither reviewer had attended her classes, and turned down Ms. Wolfe's requests for them to attend her class, she was given a 64 out of 100 on her performance review.

170.    "N/A" was written on each area of Ms. Wolfe's performance review that called for elaboration on areas of improvement.

171.    Puzzled by this lack of feedback, Ms. Wolfe asked why she received a 64 out of 100.

172.    Ms. Wolfe was told that she received a 64 out of 100 on her performance review solely because she placed her bag and shoes in the employee office, instead of in a locker; and because she was once a few minutes late to class due to a transportation delay.

173.    In response to the issue that she had placed her bag and shoes in the wrong location, Ms. Wolfe explained that she was just following the instruction of other senior instructors, and that no one had ever warned her that this was not the correct location to put her bag and shoes.

174.    In response to the issue that Ms. Wolfe was a few minutes late for class once, she explained that the delay was caused by the fact that a subway was running with delays while returning from helping a Flywheel customer with a hospital stay that was necessitated after a Flywheel class. After the customer started feeling ill during a Flywheel class, Ms. Wolfe helped the customer to the hospital, and stayed with the customer overnight in the hospital. Ms. Wolfe and the customer bonded through the process.  In fact, Flywheel was generally aware of how Ms. Wolfe had helped the customer, and Flywheel arranged a complimentary membership for the customer, and it was rumored that Flywheel considered installing a Flywheel bicycle in the customer's apartment.  The Flywheel media team even posted a blog on their website boasting about how Ms. Wolfe had helped the customer. The blog quoted the customer, and a photo was taken for promotional purposes of Ms. Wolfe and the customer together:

"My friendship with instructor Melissa Wolfe is the most incredible thing to come from Flywheel. When I'm too sick to make it to class, Melissa has sent me her playlist so that I can listen along from home. During a weeklong hospital stay earlier this year, Melissa was with me every day and overnight. Knowing that I wanted to be at Flywheel instead of in

29

a hospital bed, she helped me to walk laps and do barre exercises around the oncology floor. Weeks after being discharged, once I finally was well enough to return to Melissa's class, it felt like a huge success! A month earlier she and I were slowly towing my IV pole around the hospital, and now I was back on the bike with her. Sharing the lows of my illness with Melissa makes the ups that much sweeter, and her class is where I work the hardest and have the most fun! I couldn't have predicted meeting one of my closest friends through Flywheel."



175.    However, Devine-Baum used this instance against Ms. Wolfe to punish her and attempt to push her out by issuing her a sham performance review, while at the same time benefitting from the goodwill Ms. Wolfe created for the company, and boasting of it on the Flywheel website to attract more customers.

176.    In January 2014, Ms. Wolfe had a technical issue with the Flywheel studio sound system during her class.

177.    Alexander was scheduled to teach the following class, and Ms. Wolfe politely told him that the sound system wasn't functioning correctly.

178.    In response, Alexander mumbled back, "Fucking don't."

179.    Afterward, Ms. Wolfe reported the incident to Devine-Baum, and explained that she continued to feel very uncomfortable being scheduled for classes right after or right before Alexander's classes.

180.    In response to reporting the continued harassment by Alexander, Devine-Baum threatened Ms. Wolfe by saying, "there are no other classes available and if you chose not to teach that time slot, I will not guarantee there is another."

181.    On February 5, 2014, Ms. Wolfe e-mailed Ruth Zukerman, co-Founder and Creative Director of Flywheel to discuss the way Alexander had been treating her since she reported that he was sexually harassing her, and had been retaliated by Devine-Baum.

182.    On February 10, 2014, Ms. Wolfe and Zukerman met. Plaintiff Wolfe explained to Zukerman that she continued to feel that Devine-Baum was retaliating against her for reporting sexual harassment by Alexander, who was a close personal friend of Devine-Baum, by giving Ms. Wolfe only one class per week, scheduling her classes to be immediately before or after Alexander's, telling Plaintiff her performance was satisfactory, yet rating her a 64 out of 100 on her performance review.

183.    In response, Zukerman stated, "This is a known problem." Zukerman further stated, "there is no need for empathy for Danielle [Devine-Baum], the way she targets staff has been brought up before and will be addressed again."

184.    Zukerman also stated, "Jesse [Alexander] is a long-term and successful part of fly-fam. This does not excuse his actions. But, I want to do right by him."

185.    In retaliation for reporting Devine-Baum to Zukerman, Devine-Baum began scheduling Ms. Wolfe an impossible schedule of classes to teach in order to push her out of the company.

186.    After reporting to Zukerman, Devine-Baum scheduled Ms. Wolfe to teach seven days per week, without a single day off, for several months, including the last class of the day, followed by the first class of the next morning, three to four days per week.

187.    No other instructor had been given such a schedule.

188.    In fact, when Ms. Wolfe's schedule was posted online for all co-workers to see, many of Ms. Wolfe's co-workers commented that the schedule was "crazy" and that they would never physically be able to work such a grueling schedule.

189.    Ms. Wolfe now labored under a seven-day-per-week schedule, on top of running into Alexander in-between classes, who continued to mumble things under his breath as they passed.

190.    In late-March, early-April 2014, while working at the Flywheel Lincoln Square studio, Ms. Wolfe encountered Zukerman in passing.

191.    During that interaction, Ms. Wolfe reported to Zukerman the continued inappropriate behavior by Alexander, and the continued retaliation by Devine-Baum.

192.    In response, Zukerman stated, "O.K., thanks, Wendy", and walked away.

193.    Another co-worker overheard the interaction, and later asked Ms. Wolfe, "Did she just call you Wendy?"

194.    In Spring 2015, Ms. Wolfe contacted Kayle Powers, a Human Resources Manager at Flywheel to report the continued sexual harassment and retaliation.

195.    During her conversation with Powers, Ms. Wolfe detailed at length the history of sexual harassment by Alexander, and how her work schedule was affected thereafter by Devine-Baum, including first being given only one shift a week, then after complaining to Zukerman, being scheduled seven days per week for several months, as well as being punished in the performance review, despite being told her performance had been satisfactory up until then.

196.    In response, Powers warned her that given the serious nature of the "accusations", Ms. Wolfe's complaint and name would be shared with her harassers.

197.    Thereafter, on May 9, 2014, after teaching a class at the Flywheel Lincoln Square studio, Ms. Wolfe saw she had a voicemail from Devine-Baum. The voicemail from Devine-Baum stated,  "I don't feel this is a healthy job for you, and I am removing you from the schedule."

198.    Ms. Wolfe called Devine-Baum back to ask why she was being removed from the schedule.

199.    Devine-Baum stated that she had seen a post on Ms. Wolfe's Facebook wherein she asked for a recommendation for a chiropractor, and that Devine-Baum "couldn't have instructors posting on Facebook that they need medical care." Devine-Baum further stated that "I don't want to hear your opinion. This is non-negotiable."

200.    At 4:40pm on May 9, 2014, Devine-Baum e-mailed Ms. Wolfe the following:

May 9, 2014, às 4:40 PM, Danielle Devine-Baum ddevine@flywheelsports.com escreveu:

Hi Melissa-

I just left you a voicemail, but we are going to require a doctor's note for you to teach.

We are subbing out your classes tomorrow, and putting instructors on call for your classes on Sunday in case you happen to be able to get a note tomorrow.

Thanks,
DDB


Danielle Devine-Baum
Flywheel Sports
ddevine@flywheelsports.com
O: 212-242-9433

201.    In response, Ms. Wolfe e-mailed Devine-Baum the following:

On May 9, 2014, at 6:00 PM, Melissa Wolfe <mwolfe@flywheelsports.com> wrote:

33

Hi Danielle,

I'm getting a doctors note for you right now & would like to teach tomorrow. I am cleared & well, & not I. the financial position to lose the classes.

Please let me know.

Thanks!

202.    Ms. Wolfe was perplexed as to why she was now being required to provide a doctor's note so that she could be put back on the schedule.

203.    Ms. Wolfe contacted Hickl and a Flywheel human resources representative to inquire why a doctor's note now being required of her in order to be put back on the schedule.

204.    Hickl did not immediately respond to Ms. Wolfe.

205.    The Flywheel human resources representative told Ms. Wolfe that she could not over ride Devine-Baum's judgment call, and instructed her to visit a doctor, undergo an examination and to get a note that she was clear to work.

206.    Ms. Wolfe found a chiropractor that same day, and he wrote Ms. Wolfe a letter clearing her for work. Ms. Wolfe submitted the letter to Defendant later that evening.

207.    However, Ms. Wolfe was not allowed to teach her scheduled classes that day.

208.    From approximately late-February to mid-July 2014, Ms. Wolfe had been scheduled, seven days per week, without a single day off.

209.    On numerous occasions Ms. Wolfe asked Devine-Baum for one day off, but these requests were always rejected.

210.    At the same time, Ms. Wolfe's co-workers were regularly granted time off or schedule changes.

211.    On July 20, 2014, Ms. Wolfe explained to Hickl that she had been scheduled to teach seven days per week for several months, without a single day off.

212.    Fearing for her job, Ms. Wolfe asked Hickl if she thought she was on good enough terms with Devine-Baum to ask Devine-Baum for a day off.

213.    In response, Hickl advised Ms. Wolfe to request a day off.

214.    On July 21, 2014, after not having been scheduled a day off in months, Ms. Wolfe requested that Devine-Baum schedule her one day off per week moving forward.

215.    Devine-Baum did not answer Ms. Wolfe's e-mail.

216.    Ms. Wolfe followed up with another e-mail to Devine-Baum requesting one day off per week moving forward.

217.    Again, Devine-Baum did not answer Ms. Wolfe's e-mail.

218.    On August 4, 2014, Ms. Wolfe e-mailed Hickl to explain that her request for one day off per week was being ignored by Devine-Baum. Ms. Wolfe asked Hickl what to do next, saying,

>    I feel like I'm never going to get myself out of the hole with her. cc'ing Ruth is just going to dig it even deeper & ultimately I'm pretty much at her mercy re: my job. I feel like it continues to leave me walking on eggshells if I speak up.

219.    Hickl told Ms. Wolfe to e-mail Devine-Baum again, and this time carbon-copy Zukerman.

220.    On August 14, 2014, Ms. Wolfe e-mailed Devine-Baum and carbon-copied Zukerman, per Hickl's instructions.

221.    Shortly after the August 14 e-mail, Devine-Baum replied to Ms. Wolfe. Devine-Baum stated that Ms. Wolfe had not been clear in stating that she wanted a day off, and that she should have "double confirmed", despite the fact that she had made numerous requests

for one day off per week. After this, Devine-Baum finally granted a six-day per week schedule to Ms. Wolfe.

**Ms. Wolfe Disclosed to Zukerman She Had Breast Cancer**

222.     On or about November 2014, Ms.Wolfe, via e-mail, privately disclosed Zukerman that she had been diagnosed with breast cancer, and requested leave from two classes per week, for three weeks, while Ms. Wolfe underwent radiation treatment for the cancer.

223.     Instead of receiving a response from Zukerman, Ms. Wolfe received a response from Devine-Baum on November 20, 2014, wherein Devine-Baum carbon-copied Rachel Zukerman, a Flywheel Development Coordinator, stating the following:

> **Re:** Chelsea classes
>
> **Date:** 11.20.2014 17:09
>
> **From:** Danielle Devine-Baum danielle@flywheelsports.com
>
> **To:** Melissa Wolfe mwolfe@flywheelsports.com
>
> **Cc:** Rachel Zukerman <Rachel@flywheelsports.com>
>
> Hi Melissa-
>
> Ruth passed along to me your desire to drop your Tues/Thurs Chelsea 730 PM slots. We are going to be able to cover those for you ASAP (Rachel can confirm the start date). I believe you had also requested to get the slots back after the holidays but we can not guarantee that will happen as we will be reassigning them.
>
> Thanks,
> DDB
>
> Danielle Devine-Baum
> Flywheel Sports
> danielle@flywheelsports.com
> O:  (646) 661-7393 ext 252

224.    On November 24, 2014, Ms. Wolfe e-mailed the Human Resources Manager at Flywheel, Kayle Powers, reiterating the history of sexual harassment and retaliation by Alexander, the retaliation by Devine-Baum, as well as Zukerman's failure to even acknowledge her request for a reasonable accommodation due to breast cancer.

225.    Powers responded that she was unaware of Alexander's conduct toward Plaintiff Wolfe.

226.    Plaintiff Wolfe replied to Powers stating that Alexander's conduct had persisted since August 11, 2013, and had not been effectively remediated.

227.    Powers did not follow up further regarding Alexander's conduct toward Plaintiff Wolfe.

228.    Powers informed Plaintiff Wolfe that she could take off two classes per week, for three weeks to attend to radiation therapy.

229.    On November 25, 2014, having not received a reply from Zukerman regarding her request for accommodations due to breast cancer, Ms. Wolfe requested another meeting with Zukerman to discuss how her request for accommodation had been handled.

230.    On November 25, 2014, Zukerman set up a meeting between herself, Ms. Wolfe, and CEO and Co-Founder Jay Galluzzo to "address all your concerns with Flywheel".

231.    At the meeting, Zukerman denied ever receiving an e-mail regarding Ms. Wolfe's breast cancer and her request for time off, despite acknowledging that Zukerman had told Devine-Baum to speak with Ms. Wolfe regarding her request for two classes off per week, for three weeks.

232.    Zukerman looked embarrassed when Ms. Wolfe showed Zukerman and Galluzzo the e-mail she had sent to Zukerman in which she described her breast cancer and need for radiation treatment, and her request for two classes off per week, for three weeks.

233.    Galluzzo jumped in to defend Zukerman by saying, "Since I don't even work here anymore, I have the pleasure of being able to say really whatever I want. Ruth gets so many e-mails every day, she really doesn't have time for all the drama from you instructors."

234.    Thereafter, Galluzzo and Zukerman took turns berating Ms. Wolfe.

235.    First, Galluzzo and Zukerman chastised Ms. Wolfe for not wanting to make her cancer public. Zukerman criticized Ms. Wolfe, saying 'it is absurd to say that you don't want people to know that you have cancer".

236.    Thereafter, Galluzzo and Zukerman took turns mocking Ms. Wolfe's request for time off to manage her breast cancer by doing impressions of instructors who they found annoying. Using two instructors as examples, in high pitched, crying voices, they said, "I'm Holly Rilinger and I'm leaving town tomorrow for Nike so cover my classes! My name is Kate Hickl, I'm a diva and I refuse to teach at studios where the sound system makes me strain my vocal cords."

237.    After laughing at each other's impressions, Galluzzo resumed telling Ms. Wolfe that she couldn't expect Zukerman to have time to help her whenever she needed it.

238.    On December 12, 2014, Ms. Wolfe taught a 12:30 p.m. class at the Flywheel Lincoln Square studio.

239.    Immediately after the class, Flywheel Human Resources Manager Kayle Powers e-mailed Ms. Wolfe, asking her to call, and thereafter, Ms. Wolfe called Powers.

240.    Powers informed Ms. Wolfe by phone that the Chief Marketing Officer, Tamara Odinec, had been in her 12:30 p.m. class, and called Human Resources afterward to say that Ms. Wolfe "looked too ill to be teaching classes."

241.    Thereafter, Powers asked Ms. Wolfe if the cancer was affecting her ability to perform her job.

242.    Ms. Wolfe replied that she was healthy enough to be teaching classes, and was offended at by Odinec's suggestion that she was "too ill to be teaching classes", and questioned Powers regarding how Odinec knew Ms. Wolfe had breast cancer.

243.    Powers disregarded Ms. Wolfe's concerns, and instead chided her for allegedly talking with others about how Zukerman and Galluzzo treated her during the late-November 2014 meeting, saying, "We can't have anyone talking badly about our founder".

244.    On December 4, 2014, Devine-Baum e-mailed all Flywheel instructors that she would not be conducting annual performance reviews for 2014.

245.    On July 14, 2015, Ms. Wolfe received the following e-mail from Zukerman:

Instructors,

As some of you might be aware, Jesse Alexander is no longer with Flywheel. We thank him for a wonderful five years and wish him the best of luck in the future. As employees of the company, we ask that you all refrain from posting about this or commenting on social media. If you have any questions, please feel free to contact us in the office tomorrow.

Best,
Ruth & Dana

246.    On March 31, 2016, Ms. Wolfe had a meeting with her new Flywheel Instructor Coordinators, Jaimie Bailey and Kara Bocchi. They informed Ms. Wolfe that they were reducing her class schedule to 11 classes per week, and added, " We know you've had some medical issues in the past, so we really think this will actually be better for you."

247.    On June 1, 2016, Ms. Wolfe learned from two co-workers that Plaintiff Wolfe was being terminated.

248.    At 12:30 p.m., on June 1, 2016, Ms. Wolfe texted Jaimie Bailey, to ask why her co-workers were under the impression she was being terminated.

249.    Shortly thereafter, Bailey and Ms. Wolfe spoke by phone. Bailey denied knowing

anything regarding any plans to terminate Ms. Wolfe.

250.    Around 11:00 p.m., Ms. Wolfe received an e-mail from Bailey, carbon-copying

Devine-Baum, that stated the following:

> Hey Melissa! I just wanted to reach out to you about our conversation from earlier
> this afternoon as Danielle and I are concerned as to why anyone other than DDB or
> myself would be discussing your standing in the company. Clearly these rumors are
> misguided and misinformed. Please keep me looped in if any of this comes up again
> at any point. Talk to you Friday!

251.    On June 3, 2016, Bailey and Ms. Wolfe had a phone call to discuss new customer

attendance quotas for Ms. Wolfe that pertained to an app called ClassPass.

252.    Flywheel customers using ClassPass could attend Ms. Wolfe's class a discounted

rate, instead of paying the regular $34 per Flywheel class.

253.    However, Ms. Wolfe did not have control over how many ClassPass spaces were

available in her classes.

254.    As a result, given the choice between paying the regular $34 per class rate, and the

discounted ClassPass rate, many customers opted to sign up for Ms. Wolfe's class vis-à-vis

ClassPass, or if all of Ms. Wolfe's ClassPass spaces were full, many customers opted to take

a different class with open ClassPass spaces.

255.    Despite Defendant having sole control over how many ClassPass spaces were

available in Ms. Wolfe's classes, Bailey required Ms. Wolfe to increase her non-ClassPass

customer attendance by 30% in 30 days.

256.    Ms. Wolfe responded to Bailey that it was impossible to meet those customer

attendance quotas because her $34 classes were now competing with similar Flywheel

classes that cost less vis a vis ClassPass.

257.    On June 14, 2016, Bailey e-mailed Ms. Wolfe to set up another date to discuss her

customer attendance quotas on June 16, 2016, along with Human Resources Director,

Melanie Luftman.

258.    At the June 16, 2016 meeting, Bailey told Ms. Wolfe she was being terminated, and

thereafter terminated Ms. Wolfe on July 29, 2016.

259.    Over the course of her employment, Ms. Wolfe has suffered extreme anxiety,

depression, fatigue, loss of self-confidence, and sleeplessness, as a result of Alexander's

sexual harassment, Devine-Baum's retaliation for reporting sexual harassment, and both

Zukerman and Galluzzo's conduct in handling and disclosing her confidential and sensitive

medical information to employees without a business need to know, among other unlawful

conduct by Defendant.

## FIRST CAUSE OF ACTION
### (FLSA – Failure to Pay Wages)
### As to Plaintiff and the FLSA Collective

260.    Plaintiff, on behalf of herself and the FLSA Collective, realleges and incorporates by

reference each allegation in the foregoing paragraphs as though fully set forth herein.

261.    Plaintiff and the members of the FLSA Collective are non-exempt employees

entitled to be paid at least the applicable federal minimum wage for all hours worked.

262.    Defendant employed Plaintiff and the members of the FLSA Collective, but failed to

pay them for all hours worked, including at their overtime wage rates, and hours worked

during their "training", as well as for time Defendant required them to perform various tasks

outside of teaching classes, including, but not limited to preparing for class, developing

routines, compiling playlists, communicating with customers, attending meetings, and

engaging in marketing on behalf of the company.

263.    Defendant failed to keep accurate records of time worked by Plaintiff and the members of the FLSA Collective.

264.    Defendant's violations of the FLSA, as described in this Collective Action Complaint, have been willful and intentional.

265.    Defendant did not make a good faith effort to comply with the FLSA with respect to its compensation to Plaintiff and the FLSA Collective.

266.    Because Defendant's violations of the FLSA were willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

267.    Plaintiff has expressed her consent to make these claims against the Defendant by filing a written consent form, pursuant to 29 U.S.C. § 216(b).

268.    As a consequence of the willful underpayment of wages, alleged above, Plaintiff has incurred damages thereby and the Defendant is indebted to her in the amount of the unpaid overtime compensation, together with interest, liquidated damages, attorneys' fees, and costs in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**(NYLL- Failure to Pay Wages)**
**As to Plaintiff and the New York Class**

269.    Plaintiff, on behalf of herself and the New York Class, realleges and incorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

270.    Defendant employed Plaintiff and the members of the New York Class willfully failed to compensate Plaintiff and the members of the New York Class for all hours worked, including at their overtime wage rates, and hours worked during their "training", as well as for time Defendant required them to perform various tasks outside of teaching classes, including, but not limited to preparing for class, developing routines, compiling playlists,

communicating with customers, attending meetings, and engaging in marketing on behalf of the company, in violation of the requirements of NYLL.

271.   By the course of conduct set forth above, Defendant has violated N.Y. Lab. Law § 650 *et seq.*; 12 N.Y.C.R.R. § 142 *et seq.*

272.   Defendant failed to keep, make, preserve, maintain and furnish accurate records of time worked by Plaintiff and the members of the New York Class.

273.   Defendant has a policy and practice of refusing to pay for all hours worked, including at the overtime wage rate, by Plaintiff and the members of the New York Class.

274.   Defendant's failure to pay for all hours worked, including at the overtime wage rate, by Plaintiff and the members of the New York Class was willful within the meaning of N.Y. Lab. Law § 663.

275.   As a consequence of the willful failure to pay wages, including at the overtime wage rate, alleged above, Plaintiff and the members of the New York Class have incurred damages thereby and the Defendant is indebted to them in the amount of the unpaid wages, and such other legal and equitable relief due to Defendant's unlawful and willful conduct, as the Court deems just and proper.

276.   Plaintiff, on behalf of herself and the members of the New York Class, seeks recovery of liquidated damages, attorneys' fees, interest, and costs to be paid by the Defendant as provided by the NYLL.

### THIRD CAUSE OF ACTION
**(NYLL – Violation of Wage Notice and Statement Requirements)**
**As to Plaintiff and the Wage Notice and Wage Statement Class**

277.   Plaintiff, on behalf of herself and the Wage Notice and Wage Statement Class, realleges and incorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

278.   Defendant failed to supply Plaintiff and the members of the Wage Notice Class notice as required by N.Y. Lab. Law  § 195, in English or in the language identified by Plaintiff and the members of the Wage Notice Class as their primary language, containing Plaintiff's and the members of the Wage Notice Class' rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; hourly rate or rates of pay and overtime rate or rates of pay if applicable; the regular pay day designated by the employer in accordance with N.Y. Lab. Law § 191; the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer; plus such other information as the commissioner deems material and necessary.

279.   Defendant failed to supply Plaintiff and the members of the Wage Statement Class with an accurate statement of wages as required by N.Y. Lab. Law § 195, containing the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; hourly rate or rates of pay and overtime rate or rates of pay if applicable; the number of hours worked, including overtime hours worked if applicable; deductions; and net wages.

280.   Due to Defendant's violations of N.Y. Lab. Law § 195, Plaintiff and members of the Wage Notice and Wage Statement Classes are entitled to damages of $50 for each workweek that Defendant failed to provide Plaintiff and the members of the Wage Notice Class with a wage notice, or a total of $2,500, and damages of $100 for each workweek that Defendants failed to provide Plaintiff and the members of the Wage Statement Class with

accurate wage statements, or a total $2,500, as provided for by N.Y. Lab. Law § 198,

reasonable attorneys' fees, costs, and injunctive and declaratory relief.

### FOURTH CAUSE OF ACTION
#### (NYSHRL – Sex Discrimination)
#### As to Plaintiff

281.    Plaintiff realleges and incorporates by reference each allegation in the foregoing

paragraphs as though fully set forth herein.

282.    As a woman, Plaintiff is a member of classes protected by New York State Executive

Law § 296(1)(a) ("NYSHRL").

283.    Defendant discriminated against Plaintiff on the basis of sex, in violation of

NYSHRL, including, but not limited to creating and maintaining a sex-based hostile work

environment, and by failing and refusing to take appropriate remedial action in response to

Plaintiff's numerous reports of sexual harassment.

284.    By failing and refusing to take appropriate remedial action, Defendant ratified and

condoned the perpetrator's behavior, effectively giving him permission to continue.

285.    As a result of Defendant's unlawful discriminatory actions, Plaintiff has suffered lost

wages, emotional distress, and other compensatory damages.

286.    As a consequence of its actions, Defendant is liable to Plaintiff for back pay, front

pay, emotional distress, and other compensatory damages, costs, and disbursements in this

action.

### FIFTH CAUSE OF ACTION
#### (NYSHRL – Disability Discrimination)
#### As to Plaintiff

287.    Plaintiff realleges and incorporates by reference each allegation in the foregoing

paragraphs as though fully set forth herein.

288.    At all times relevant, Plaintiff was disabled within the meaning of the NYSHRL because she suffered from a physical and medical impairment resulting from being diagnosed with breast cancer, an anatomical and/or physiological condition which prevents the exercise of the normal bodily function of normal cell growth, caring for oneself, concentration, and sleeping, and is demonstrable by medically accepted clinical and/or laboratory diagnostic techniques.

289.    In spite of her disability, Plaintiff was fully capable of performing the essential functions of her job as a Flywheel class instructor with/without a reasonable accommodation.

290.    Defendant discriminated against Plaintiff, *inter alia,* by failing to treat her medical information as a confidential record and by disclosing such information to persons with no lawful privilege to receive such information, and by removing Defendant from her classes after she requested a reasonable accommodation.

291.    The effect of the practices complained of herein has been to deprive Plaintiff of equal employment opportunities and otherwise to limit, segregate or classify her because of her disability and/or her record of such disability, and/or because Defendant regarded her as disabled.

292.    The unlawful employment practices complained of herein were and are malicious, intentional and in reckless disregard of Plaintiff's health and well-being.  As a result of Defendant's acts, Plaintiff has suffered grievous, extensive and continuing damages, including but not limited to pain and suffering, humiliation, emotional distress, lost wages and benefits, punitive damages and attorneys' fees.

**SIXTH CAUSE OF ACTION**
**(NYSHRL – Retaliation)**
**As to Plaintiff**

293.    Plaintiff realleges and incorporates by reference each allegation in the foregoing

paragraphs as though fully set forth herein.

294.    Defendant retaliated against Plaintiff in violation of the NYSHRL, including, but not

limited to, the following:

    a.  Placing menacing phone calls and texts from Plaintiff's harasser, Jesse Alexander, immediately after making a report of sexual harassment against him.

    b.  Scheduling Plaintiff one class per week immediately after making a report of sexual harassment, while others were scheduled multiple times per week, which affected Plaintiff's compensation as she was paid strictly on a per class basis.

    c.  Scheduling Plaintiff's classes right before or right after her harasser, Alexander, which allowed him an opportunity to further retaliate by bad-mouthing her and her classes to customers, and harass her in passing.

    d.  Refusing to schedule Plaintiff for more classes, despite offering other instructors additional classes.

    e.  Issuing Plaintiff a sham 2013 performance review.

    f.  Threatening to terminate Plaintiff if she did not assent to continue to be scheduled for classes immediately before or after her harasser, Alexander.

    g.  Scheduling Plaintiff seven days per week, every week for several months without a day off, including the first morning shift, and the last evening shift three to four times per week, after reporting Alexander's harassing conduct and Devine-Baum's retaliatory conduct to Zukerman.

    h.  Removing Plaintiff from her schedule after reporting Alexander's and Devine-Baum's retaliatory conduct to Human Resources.

    i.  Denying her multiple requests for time off, including one day per week off, during a grueling seven-day-per-week schedule that spanned several months without a day off, while other instructors regularly were granted time off.

    j.  Revealing medical information disclosed in private to obtain leave to other employees who had no legitimate business need for such information.

    k.  Ridiculing and mocking Plaintiff for requesting leave to care for her breast cancer, and insisting that she share her personal medical information with the public.

    l.  Removing Plaintiff again from her schedule shortly after requesting time off to care for her breast cancer.

m.  Terminating Plaintiff.

295.     The unlawful employment practices complained of herein were and are malicious, intentional and in reckless disregard of Plaintiff's health and well-being.  As a result of Defendant's acts, Plaintiff has suffered grievous, extensive and continuing damages, including but not limited to pain and suffering, humiliation, emotional distress, lost wages and benefits, punitive damages and attorneys' fees.

**SEVENTH CAUSE OF ACTION**
**(NYCHRL – Sex Discrimination)**
**As to Plaintiff**

296.     Plaintiff realleges and incorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

297.     By the aforementioned acts, Defendant, through its managerial employees and agents, discriminated against Plaintiff on the basis of her sex in the terms and conditions of her employment, and engaged in a pattern of pervasive and/or severe sexual harassment in violation of §8-107 of the New York City Human Rights Law, as amended by the Restoration Act ("NYCHRL").

298.     Defendant's actions and the actions of their managerial employees and agents, had the purpose and/or effect of creating an intimidating, hostile or offensive working environment which would reasonably be perceived, and was perceived by Plaintiff, as hostile or abuse.

299.     Defendant condoned and/or ratified the discriminatory conduct, and/or failed to take remedial action in violation of the NYCHRL.

300.     As a result of the discriminatory and/or retaliatory acts of the Defendant and its agents, Plaintiff has suffered and will continue to suffer irreparable injury, economic harm,

physical injury, emotional distress, and other compensable damages unless and until this Court grants relief pursuant to the NYCHRL.

### EIGTH CAUSE OF ACTION
**(NYCHRL – Disability Discrimination)**
**As to Plaintiff**

301.    Plaintiff realleges and incorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

302.    At all times relevant, Plaintiff was disabled within the meaning of the NYCHRL because she suffered from a physical and medical impairment resulting from being diagnosed with breast cancer, an anatomical and/or physiological condition which prevents the exercise of the normal bodily function of normal cell growth, caring for oneself, concentration, and sleeping, and is demonstrable by medically accepted clinical and/or laboratory diagnostic techniques.

303.    In spite of her disability, Plaintiff was fully capable of performing the essential functions of her job as a Flywheel class instructor with/without a reasonable accommodation.

304.    Defendant discriminated against Plaintiff by, *inter alia,* failing to treat her medical information as a confidential record and by disclosing such information to persons with no lawful privilege to receive such information, and by removing Defendant from her schedule after she requested a reasonable accommodation.

305.    The effect of the practices complained of herein has been to deprive Plaintiff of equal employment opportunities and otherwise to limit, segregate or classify her because of her disability and/or her record of such disability, and/or because Defendant regarded her as disabled.

49

306.   The unlawful employment practices complained of herein were and are malicious,

intentional and in reckless disregard of Plaintiff's health and well-being.  As a result of

Defendant's acts, Plaintiff has suffered grievous, extensive and continuing damages,

including but not limited to pain and suffering, humiliation, emotional distress, lost wages

and benefits, punitive damages and attorneys' fees.

### NINTH CAUSE OF ACTION
#### (NYCHRL – Retaliation)
#### As to Plaintiff

307.   Plaintiff realleges and incorporates by reference each allegation in the foregoing

paragraphs as though fully set forth herein.

308.   Defendant retaliated against Plaintiff in violation of the NYCHRL, including, but not

limited to, the following:

   a.  Placing menacing phone calls and texts from Plaintiff's harasser, Jesse Alexander,
       immediately after making a report of sexual harassment against him.

   b.  Scheduling Plaintiff one class per week immediately after making a report of sexual
       harassment, while others were scheduled multiple times per week, which affected
       Plaintiff's compensation as she was paid strictly on a per class basis.

   c.  Scheduling Plaintiff's classes right before or right after her harasser, Alexander,
       which allowed him an opportunity to further retaliate by bad-mouthing her and her
       classes to customers, and harass her in passing.

   d.  Refusing to schedule Plaintiff for more classes, despite offering other instructors
       additional classes.

   e.  Issuing Plaintiff a sham 2013 performance review.

   f.  Threatening to terminate Plaintiff if she did not assent to continue to be scheduled
       for classes immediately before or after her harasser, Alexander.

   g.  Scheduling Plaintiff seven days per week, every week for several months without a
       day off, including the first morning shift, and the last evening shift three to four
       times per week, after reporting Alexander's harassing conduct and Devine-Baum's
       retaliatory conduct to Zukerman.

h.   Removing Plaintiff from her schedule after reporting Alexander's and Devine-Baum's retaliatory conduct to Human Resources.

i.   Denying her multiple requests for time off, including one day per week off, during a grueling seven-day-per-week schedule that spanned several months without a day off, while other instructors regularly were granted time off.

j.   Revealing medical information disclosed in private to obtain leave to other employees who had no legitimate business need for such information.

k.   Ridiculing and mocking Plaintiff for requesting leave to care for her breast cancer, and insisting that she share her personal medical information with the public.

l.   Removing Plaintiff again from her schedule shortly after requesting time off to care for her breast cancer.

m.   Terminating Plaintiff.

309.   The unlawful employment practices complained of herein were and are malicious, intentional and in reckless disregard of Plaintiff's health and well-being.  As a result of defendants' acts, plaintiff has suffered grievous, extensive and continuing damages, including but not limited to pain and suffering, humiliation, emotional distress, lost wages and benefits, punitive damages and attorneys' fees.

**TENTH CAUSE OF ACTION**
**(FMLA – Unlawful Disclosure of Medical Information and Interference)**
**As to Plaintiff**

310.   Plaintiff realleges and incorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

311.   At all times relevant, Plaintiff was "eligible" under the definition of the Family Medical Leave Act ("FMLA") and was entitled to take unpaid leave.

312.   Plaintiff gave notice to Defendant that she intended to take leave for a serious medical condition.

313.     Defendant discriminated against Plaintiff by, *inter alia,* failing to treat her medical information as a confidential record and by disclosing such information to persons with no lawful privilege to receive such information in violation of 29 C.F.R. § 825.500(g), as well as denying, in part, her request for leave to which she was entitled under the FMLA.

314.     Defendant's actions were intentional and in reckless disregard of the health and well being of the Plaintiff.  As a result of these acts, the Plaintiff has suffered grievous, extensive and continuing damages, including, but not limited to, lost wages and benefits, liquidated damages, attorney's fees and the costs of this action.

**ELEVENTH CAUSE OF ACTION**
**(FMLA – Willfulness)**
**As to Plaintiff**

315.     Plaintiff realleges and incorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

316.     Defendant's acts complained of herein were willful.

**JURY TRIAL DEMANDED**

Plaintiff demands a jury trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and all others similarly situated, seeks the following relief:

a.  That, at the earliest possible time, Plaintiff be allowed to give notice of this action, or that the Court issue such notice, to all persons who are presently, or have at any time during the three years immediately preceding the filing of this suit, up through and including the date of this Court's issuance of court-supervised notice, were employed by Defendants as instructors.  Such notice shall inform them that this civil action has

been filed, of the nature of the action, and of their right to join this lawsuit if they believe they were denied proper wages;

b. Certification of this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

c. Designation of Plaintiff as representative of the Rule 23 Class, and counsel of record as Class Counsel;

d. Unpaid wages, including overtime pursuant to the FLSA and the supporting United States Department of Labor regulations;

e. Unpaid wages, including overtime, pursuant to the NYLL;

f. Liquidated damages relating to unpaid wages and overtime, as provided for by FLSA § 216(b) and NYLL § 215(d); and

g. Pre-judgment interest and post-judgment interest as provided by law;

h. Damages of $50 for Plaintiff and the Wage Notice Class for each workweek that Defendants failed to provide Plaintiff and the Wage Notice Class with a wage notice, or a total of $2,500, as provided for by N.Y. Lab. Law § 198;

i. Damages of $100 for Plaintiff and the Wage Statement Class for each workweek that Defendant failed to provide Plaintiff and the Wage Statement Class with accurate wage statements, or a total of $2,500, as provided for by N.Y. Lab. Law § 198;

j. Issuance of a declaratory judgment that the practices complained of in this action are unlawful under N.Y. Lab. Law § 190 *et seq*.;

k. Attorneys' fees and costs of the action;

**WHEREFORE**, Plaintiff, on behalf of herself, seeks the following relief:

a. An order declaring that the acts and practices complained of herein are in violation of the New York State Human Rights Law;

b.   An order declaring that the acts and practices complained of herein are in violation of the New York City Human Rights Law;

c.   An order enjoining and permanently restraining these violations of the New York State Human Rights Law;

d.   An order enjoining and permanently restraining these violations of the New York City Human Rights Law;

e.   An order declaring that the acts and practices complained of herein are in violation of the Family Medical Leave Act;

f.   An order enjoining and permanently restraining these violations of the Family Medical Leave Act;

g.   back pay, front pay, and other benefits of employment, including applicable medical and retirement benefits;

h.   compensatory damages for emotional distress;

i.   punitive damages;

j.   interest;

k.   attorneys' fees, costs and disbursements; and

l.   For other such relief as this Court deems to be just and equitable.


Dated:  New York, NY
        August 7, 2016

                                    Respectfully submitted,

                                    **LISZKA & GRAY, LLC**

                                    s/ Zachary J. Liszka
                                    Zachary J. Liszka, Esq. (ZL8359)
                                    Sam Gray, Esq.
                                    Carl J. Mayer, Esq*., of Counsel*
                                    1180 Avenue of the Americas
                                    Suite 800
                                    New York, New York 10036

347-762-5131
zachliszka@gmail.com
*Attorney for Plaintiff and the*
*Putative FLSA Collective and*
*New York Class*