**LISZKA & GRAY, LLC**
Zachary J. Liszka, Esq. (ZL8359)
Sam Gray, Esq.
Carl J. Mayer, Esq., *of Counsel*
1180 Avenue of the Americas, Suite 800
New York, New York 10036
347-762-5131
zachliszka@gmail.com
*Attorneys for Plaintiffs and the Putative*
*FLSA Collective and New York Class*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

MELISSA WOLFE, and BRYANT MONTALVO, on
behalf of themselves and all others similarly situated,

                        Plaintiff,

     -against-

FLYWHEEL SPORTS, INC.
               Defendant.

---------------------------------------------------------------X

Case No: 16-CV-06259 (PAE)

**FIRST AMENDED CLASS
ACTION COMPLAINT**

JURY TRIAL DEMANDED

       Plaintiff Melissa Wolfe (herein "Ms. Wolfe") and Plaintiff Bryant Montalvo (herein

"Mr. Montalvo"), on behalf of themselves, and a class of all others similarly situated, by and

through their attorneys, Liszka & Gray, LLC, as and for the Complaint in this action against

Defendant Flywheel Sports, Inc. (herein "Defendant"), hereby alleges upon personal

knowledge as to some, and information and belief as to the rest, as follows:

## PRELIMINARY STATEMENT

1.     Defendant is a conglomerate of upscale instructor-led gyms, with locations

throughout many major cities, including Atlanta, Boston, Chicago, Miami, Hollywood,

Charlotte, Philadelphia, Washington, D.C., Dubai, and New York City.

2.     According to Defendant Flywheel Sports, Inc.'s current CEO, Ed Kinnaly, by 2017, Defendant is looking to expand into Europe and Asia, and within five years, Kinnaly expects to have 150-175 locations across the continental US and 75 international locations.[1]

3.     Defendant requires each instructor at each location to attend a period of training in the proprietary "Flywheel Method" without any compensation, pursuant to company policy and/or practice.

4.     During the "Flywheel Method" training period, Defendant requires its instructors to perform tasks such as teaching classes to customers, canvassing the street promoting Defendant's brand, and engaging in other marketing efforts, demonstrating Defendant's bicycles in store windows, answering potential customer questions, selling Defendant's products to customers, compiling playlists of music for classes, and attending training on how to operate Defendant's proprietary software and hardware, in addition to requiring new instructors to purchase athletic uniforms and music, without compensation or reimbursement, all pursuant to company policy and/or practice.

5.     After the training period, Defendant requires each instructor at each location to work for a period of time under a piece-rate compensation scheme wherein they are paid per class they teach, regardless of the time each instructor actually works each week.

6.     Defendant requires each instructor at each location to arrive a half-hour before each 45 to 60 minute class they are to teach, and requires each instructor to stay after each class to provide feedback to customers.

7.     In addition, Defendant requires each instructor to perform various other tasks each week, including, *inter alia*, opening or unlocking the studio, setting up the computer systems, answering phones, checking in clients at the front desk, preparing for class,

---

[1] Mallory Schlossberg, ONE OF SOUL CYCLE'S FOUNDERS TURNED ON THE BRAND AND STARTED ITS BIGGEST

developing new routines, compiling playlists, communicating with customers, attending meetings, and engaging marketing efforts on behalf of the company.

8.      Defendant requires or is aware that each instructor spends approximately 15 to 28 hours per week performing these various other duties each week, in addition to the time spent teaching classes.

9.      Further, Defendant requires each instructor to purchase new music for each class, and requires them to purchase specific athletic uniforms, pursuant to company policy and practice.

10.     In fact, in an article published in Cosmopolitan entitled *12 Things I Wish I Knew Before I Became a Spin Instructor*, Kate Hickl, Defendant's Cycling Instructor and the Director of Recruiting, Training & Talent Development says the following:

> At Flywheel…it takes twice as much time to plan a class than the class itself. For every hour I'm in class, I'm spending at least two hours prepping, putting together the playlist, and figuring out the sequencing. There are people who take my class four or five times a week, so I have to keep it fresh for them. When I'm not teaching, I also spend time marketing my classes on social media. At Flywheel, instructors just starting out get paid per class — which means you're not getting paid for your prep time — but as you gain more experience, there are opportunities to become full-time…. I have to pack for each day of work like I'm going on vacation: four sets of shirts, pants, socks, sports bras, bandanas, headbands, and so on. The amount of laundry you'll do is shocking. To offset the cost of the fitness wardrobe, some instructors will work as "brand ambassadors" for fitness retailers and get discounts as well as free products to wear in exchange for promotion.[2]

11.     As a result of Defendant's piece-rate compensation scheme, depending on how many classes per week each instructor teaches at each location, instructors often work over 40 hours per workweek. However, Defendant fails to compensate each instructor paid according to the piece-rate compensation scheme at the applicable overtime rate.

---

[2] Arielle Pardes, 12 THINGS I WISH I KNEW BEFORE I BECAME A SPIN INSTRUCTOR (2016), http://www.cosmopolitan.com/career/a60972/spin-class-instructor-career/ (last visited Aug 5, 2016).

12.     To compound the problem, Defendant fails to accurately record all the hours each instructor works, as well as fails to provide accurate wage notices and wage statements, pursuant to company policy and practice.

13.     For Plaintiff Melissa Wolfe, Defendant's wage and hour violations were in addition to the fact that Defendant condoned, ratified and failed to effectively remediate the sexual harassment she faced from Defendant's Master Instructor, Jesse Alexander, who worked for Defendant for five years.

14.     Alexander groped Ms. Wolfe on a weekly, sometimes daily basis in the workplace. In fact, for a period of time, putting his hands on Ms. Wolfe's buttocks became Alexander's way of greeting her each time they interacted at work.

15.     In addition, Alexander made frequent and unwelcome sexual advances toward Ms. Wolfe in and out of the workplace, such as, "You should always ride without your shirt on. It's sexier."

16.     Further, Ms. Wolfe was discriminated against and ridiculed when she requested two classes off per week for three weeks to undergo radiation treatment for breast cancer.

17.     For example, in a meeting that was supposed to be about her request for time off to manage her breast cancer radiation treatment, then-CEO of Flywheel, Jay Galluzzo and co-Founder Ruth Zukerman took turns mocking Ms. Wolfe's request by doing impressions of other instructors who had requested time off in high-pitched, crying tones, such as, "I'm Holly Rilinger and I'm leaving town tomorrow for Nike so cover my classes! My name is Kate Hickl, I'm a diva and I refuse to teach at studios where the sound system makes me strain my vocal cords."

18.     When Ms. Wolfe complained about the sexual harassment and discrimination to her superiors, they failed to effectively remediate the situation, and failed to take immediate and

appropriate corrective action. In some cases, her superiors even made Ms. Wolfe's situation

worse, or ignored, mocked, or retaliated against her for reporting. Such instances included,

but are not limited to the following:

a. Placing menacing phone calls and texts from Ms. Wolfe's harasser, Jesse Alexander, immediately after making a report of sexual harassment against him.

b. Regularly scheduling Ms. Wolfe one class per week immediately after making a report of sexual harassment, while other instructors were regularly scheduled multiple times per week;

c. Scheduling Ms. Wolfe's classes right before or right after her harasser, Alexander, which allowed him an opportunity to further retaliate by bad-mouthing her and her classes to customers, and harass her in passing.

d. Refusing to schedule Ms. Wolfe for more classes, despite offering other instructors additional classes.

e. Issuing Ms. Wolfe a sham 2013 performance review.

f. Threatening to terminate Ms. Wolfe if she did not assent to continue to be scheduled for classes immediately before or after her harasser, Alexander.

g. Regularly scheduling Ms. Wolfe seven days per week, for several months, including the first morning shift, and the last evening shift three to four times per week, after reporting Alexander's harassing conduct and Devine-Baum's retaliatory conduct to Zukerman.

h. Removing Ms. Wolfe from her schedule after reporting Alexander's and Devine-Baum's retaliatory conduct to Human Resources.

i. Denying Ms. Wolfe multiple requests for time off, including a regularly schedule day off each week, during a grueling seven-day-per-week schedule that spanned several months, while other instructors were granted regular days off each week.

j. Revealing Ms. Wolfe's confidential and highly sensitive medical information to other employees who had no legitimate business need for such information.

k. Ridiculing and mocking Ms. Wolfe for requesting leave to care for her breast cancer, and insisting that she share her confidential and highly sensitive medical information with others.

l. Removing Ms. Wolfe again from her schedule shortly after requesting time off to care for her breast cancer.

m. Terminating Plaintiff.

19.     Ms. Wolfe and Mr. Montalvo bring this action on behalf of themselves, and all similarly situated current and former instructors, who elect to opt-in to this action pursuant to the FLSA, 29 U.S.C. §§ 201 *et seq.,* specifically the collective action provision of 29 U.S.C. § 216(b), to remedy violations of the wage-and-hour provisions of the FLSA by Defendant that have deprived Ms. Wolfe and Mr. Montalvo, and others similarly situated of their lawfully earned wages, including wages at applicable minimum wage rate and overtime rate.  Ms. Wolfe and Mr. Montalvo seek permission to give notice of this action pursuant to 29 U.S.C. § 216(b) to all persons who worked as instructors for Defendant at any time from three years immediately preceding this action.

20.     Ms. Wolfe and Mr. Montalvo also bring this action on behalf of themselves and all similarly situated current and former instructors pursuant to the Federal Rule of Civil Procedure 23 to remedy violations of NYLL Article 6 §§ 190 *et seq.*, NYLL Article 6 § 193, Article 19 §§ 650 *et seq*., and the supporting New York State Department of Labor regulations ("NYLL").

21.     Ms. Wolfe also brings this action on behalf of herself to remedy discrimination and retaliation in the terms, conditions, and privileges of Ms. Wolfe's employment on the basis of her sex and disability in violation of the New York State Human Rights Law, New York State Executive Law § 296(1)(a) ("NYSHRL").

22.     Ms. Wolfe also brings this action on behalf of herself to remedy discrimination and retaliation in the terms, conditions, and privileges of Ms. Wolfe's employment on the basis of sex and disability in violation of  §8-107 of the New York City Human Rights Law, as amended by the Restoration Act ("NYCHRL").

23.     Ms. Wolfe also brings this action on behalf of herself to correct unlawful employment practices on the basis of Ms. Wolfe's disability and medical leave status, in violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.,* ("FMLA").

## JURISDICTION AND VENUE

24.     Jurisdiction of the Court over this controversy is based upon 29 U.S.C. § 201, *et seq.*, 28 U.S.C. §§ 1331 and 1337 and the doctrine of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

25.     This Court has jurisdiction over all state law claims brought in this action pursuant to 28 U.S.C. § 1367.

26.     Upon information and belief, at all times relevant, Defendant Flywheel Sports, Inc. is and was a duly registered foreign business corporation incorporated in Delaware, with its principal office at 53 West 23rd Street, 9th Floor, New York, NY, 10010.

27.     All or a substantial part of the events or omissions giving rise to the claims herein, including all of the work Ms. Wolfe and Mr. Montalvo and the similarly situated current and former instructors performed and Defendant's failure to pay Ms. Wolfe and Mr. Montalvo and the similarly situated current and former instructors for all hours worked, occurred in New York County, State of New York and within the Judicial District for the Southern District of New York.

28.     Accordingly, this action properly lies in the Southern District of New York, pursuant to 28 U.S.C. § 1391.

## PARTIES

**Plaintiff Melissa Wolfe**

29.     Plaintiff Melissa Wolfe is a natural person who has resided in New York County during the relevant time period.

30.     Ms. Wolfe was employed by Defendant Flywheel Sports, Inc. in New York City as a cycling class instructor, from July 24, 2013 until her involuntary termination on July 29, 2016.

31.     At all times relevant, Ms. Wolfe was an "employee" within the meaning of the NYSHRL, NYCHRL, FLSA, FMLA and NYLL.

32.     Ms. Wolfe has expressed her consent to make these claims against the Defendant by filing a written consent form, pursuant to 29 U.S.C. § 216(b).  (*See* Exhibit A, annexed hereto).

**Plaintiff Bryant Montalvo**

33.     Plaintiff Bryant Montalvo is a natural person who has resided in New York County during the relevant time period.

34.     Mr. Montalvo was employed by Defendant Flywheel Sports, Inc. in New York City as a barre and cycling class instructor, from January 29, 2013 until April 5, 2016.

35.     At all times relevant, Mr. Montalvo was an "employee" within the meaning of the FLSA and the NYLL.

36.     Mr. Montalvo has expressed his consent to make these claims against the Defendant by filing a written consent form, pursuant to 29 U.S.C. § 216(b).  (*See* Exhibit C, annexed hereto).

**Defendant Flywheel Sports, Inc.**

37.     At all times hereinafter mentioned, the activities of Defendant Flywheel Sports, Inc. constituted an "enterprise" within the meaning of Section 3(r) & (s) of the FLSA, 29 U.S.C. § 203(r) & (s).

38.     At all times hereinafter mentioned, Defendant Flywheel Sports, Inc. employed employees, including Ms. Wolfe and Mr. Montalvo herein, who regularly engaged in

8

commerce or in the production of goods for commerce or in handling, selling or otherwise working on goods and materials which have moved in or been produced for commerce within the meaning of Section 3(b), (g), (i) and (j) of the FLSA, 29 U.S.C. § 203(b), (g), (i), (j), (r) & (s).

39.     Upon information and belief, Defendant Flywheel Sport's annual gross volume of business is not less than $500,000 within the meaning of 29 U.S.C. § 203(s)(A)(ii); in fact, each of the 37 plus locations hold approximately 24 classes per day, with a capacity of 50 people per class in many locations, at approximately $34 per person.

40.     Upon information and belief, Defendant employs more than 15 employees; it is believed that it employs over 900 employees.

41.     At all relevant times, Defendant Flywheel Sports, Inc. maintained control, oversight, and direction over Ms. Wolfe and Mr. Montalvo and similarly situated employees, including timekeeping, payroll, and other employment practices that applied to them.

42.     Upon information and belief, Defendant Flywheel Sports, Inc. applied the same employment policies, practices, and procedures to all instructors employed by Defendant, including policies, practices, and procedures with respect to payment of wages, deductions, and wage notices and statements.

43.     Upon information and belief, Defendant Flywheel Sports, Inc. was and still is a foreign limited liability corporation organized and existing pursuant to the laws of Delaware and authorized to do business pursuant to the laws of the State of New York.

44.     Upon information and belief, Defendant Flywheel Sports, Inc. headquarters and principal place of business was and still is 53 West 23rd Street, 9th Floor, New York, NY, 10010.

45.     Defendant Flywheel Sports, Inc. was and still is engaged in the business of operating a conglomerate of instructor-led indoor cycling gyms.

46.     Upon information and belief, at all times relevant, Defendant Flywheel Sports, Inc. is and was an "employer" within the meaning of the NYSHRL, NYCHRL, FLSA, FMLA and NYLL.

## FLSA COLLECTIVE ACTION CLAIMS

47.     Upon information and belief, there are approximately more than 40 current and former instructors that are similarly situated to Plaintiffs.

48.     Plaintiffs, and each similarly situated former or current instructor were victims of Defendant's common policy and/or plan that violated the law.

49.     Plaintiffs bring the First and Second Causes of Action, on behalf of themselves and all similarly situated persons who have worked for Defendant as instructors, and who elect to opt-in to this action.

50.     Plaintiffs represent other instructors, and are acting on behalf of the interests of those instructors, as well as their own interests in bringing this action.

51.     Plaintiffs seek to proceed as a collective action with regard to the First and Second Causes of Action, pursuant to 29 U.S.C. § 216(b) on behalf of themselves and the following:

> a.      All instructors who were employed by Defendant, any time during the 3 years prior to the filing of their respective consent forms (hereinafter referred to as the "Collective Period"), and who did not receive wages at the applicable minimum wage rate and/or overtime rate (hereinafter, the "FLSA Collective").

52.     Upon information and belief, Defendant applied the same unlawful policies and practices to Plaintiffs and the FLSA Collective, as part of a nationwide scheme.

53.     Defendant was aware or should have been aware that the law required them to pay employees, including Plaintiffs and the FLSA Collective, wages at the applicable minimum wage.

54.     Defendant was aware or should have been aware that the law required them to pay employees, including Plaintiffs and the FLSA Collective, wages at the applicable overtime rate.

55.     The FLSA Collective is readily identifiable and locatable through use of the Defendant's records.  The FLSA Collective should be notified of and allowed to opt-in to this action, pursuant to 29 U.S.C. § 216(b).  Unless the Court promptly issues such a notice, The FLSA Collective, who have been unlawfully deprived of their wages at the applicable minimum wage and/or overtime rates, in violation of the FLSA, will be unable to secure compensation to which they are entitled, and which has been unlawfully withheld from them by Defendant.

## FEDERAL RULES OF CIVIL PROCEDURE RULE 23
## CLASS ALLEGATIONS

56.     Plaintiffs sue on their own behalf and as class representatives (hereinafter, the "New York Class Representatives") and brings the Third through Sixth Causes of Action on their own behalf and as a class action, on behalf of those similarly situated, pursuant to Rule 23, sections (a) and (b), of the Federal Rules of Civil Procedure (hereinafter, the "New York Class").  The sub-classes of the New York Class are defined as:

>       a.      All instructors who were employed by Defendant in New
> York State, at any time within the 6 years prior to the filing of this
> Complaint through the entry of judgment in this matter, who
> Defendant failed to pay wages at the applicable minimum wage rate
> and/or the applicable overtime rate (hereinafter, the "NYLL Wage
> Class").

11

b.      All New York instructors who Defendant hired at any time from April 9, 2011 through the present, and who were not provided the proper wage notice pursuant to NYLL Section 195(1) (hereinafter, the "Wage Notice Class").

c.      All instructors who Defendant employed in New York State at any time from April 9, 2011 through the present, and who were not provided the proper wage statement pursuant to NYLL Section 195(3) (hereinafter, the "Wage Statement Class").

d.      All instructors who Defendant employed in New York State at anytime within the 6 years prior to the filing of this Complaint through the entry of judgment in this matter, whom Defendant required to purchase music and athletic uniforms for Defendant's benefit, but were not compensated or reimbursed. (hereinafter, the "Wage Deduction Class").

57.     The persons in the New York Class are so numerous that joinder of all members is impracticable.  Although, the precise number of such persons is unknown, and facts upon which the calculation of that number are presently within the sole control of Defendant, there are approximately more than 40 members of the New York Class.

58.     There are questions of law and fact common to the New York Class that predominate over any questions solely affecting individual members of the New York Class, including but not limited to:

a.      Whether Defendant unlawfully failed to pay wages at the applicable minimum wage rate, in violation of and within the meaning of the NYLL Article 6, §190 *et seq.*, and the supporting New York State Department of Labor Regulations, 12 N.Y.C.R.R. § 142 *et seq.*;

b.      Whether Defendant unlawfully failed to pay wages at the applicable overtime rates, in violation of and within the meaning of the NYLL Article 6, §190 *et seq.*, and the supporting New York State Department of Labor Regulations, 12 N.Y.C.R.R. § 142 *et seq.*;

c.      Whether Defendant's policy of failing to pay instructors the proper minimum wage rate was instituted willfully or with reckless disregard of the law;

b.      Whether Defendant's policy of failing to pay instructors proper overtime wages was instituted willfully or with reckless disregard of the law;

c.      Whether Defendant unlawfully failed to provide accurate and timely wage notice, pursuant to N.Y. Lab. Law § 195(1);

d.      Whether Defendant unlawfully failed to provide accurate wage statements, pursuant to N.Y. Lab. Law § 195(3);

e.      Whether Defendant unlawfully required instructors to purchase music and athletic uniforms without compensation or reimbursement, pursuant to N.Y. Lab. Law § 193;

f.      The proper measure of damages sustained by the New York Class Representative and the New York Class; and

g.      Whether Defendant should be enjoined from such violations in the future.

59.    The New York Class Representative fairly and adequately protects the interests of the New York Class and has no interests antagonistic to the class.  The Plaintiffs are represented by attorneys who are experienced and competent in both class litigation and employment litigation.

60.    A class is superior to other available methods for the fair and efficient adjudication of the controversy, particularly in the context of wage-and-hour litigation where individual plaintiffs lack the financial resources to vigorously prosecute a lawsuit in federal court against a corporate defendant.  The damages sustained by individual class members are small, compared to the expense and burden of individual prosecution of this litigation.  Class action treatment will obviate unduly duplicative litigation and the possibility of inconsistent judgments.

61.    Further, the New York Class Representative and the New York Class have been equally affected by Defendant's failure to (1) pay wages at the applicable minimum wage, and/or pay wages at the applicable overtime rates, (2) provide accurate wage notices,  (3) provide accurate wage statements, and (4) reimburse or compensate for purchases of music and athletic uniforms made for Defendant's benefit.  Moreover, members of the New York

Class still employed by Defendant may be reluctant to raise individual claims for fear of retaliation.

62.     Defendant has acted or refused to act on grounds generally applicable to the New York Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class was a whole.

63.     Plaintiffs' claims are typical of those of the class.  Plaintiffs and the New York Class members were subjected to Defendant's policies, practices, programs, procedures, protocols and plans alleged herein concerning the failure to pay wages at the applicable minimum wage rate and/or the failure to pay overtime at the applicable rate, the failure to provide accurate wage notices and statements, the failure to keep adequate records, and the failure to compensate or reimburse Plaintiffs' for purchases of music and athletic uniforms made for Defendant's benefit.  The job duties of Plaintiffs are typical of those of the class members.

64.     The New York Class Representative intends to send notice to all members of the New York Class to the extent required by Rule 23.

## CLASSWIDE FACTUAL ALLEGATIONS

65.     Plaintiffs and the members of the FLSA Collective and New York Class (collectively "Class Members") are victims of Defendant's common policy and plan that violated their rights under the FLSA and NYLL by denying them wages at the applicable minimum wage and/or overtime rates.  At all times relevant, Defendant's unlawful policy and pattern or practice was willful.

66.     All of the work performed by Class Members was assigned by Defendant and/or Defendant were aware of all the work that Plaintiffs and the Class Members performed.

67.     Upon information and belief, Defendant failed to pay each Class Member, including Plaintiffs any wages for all hours worked during a training period that Defendant required of each instructor, including Plaintiffs, pursuant to Defendant's policy and/or practice.

68.     Upon information and belief, pursuant to Defendant's policy and/or practice, after the training period, Plaintiffs and each Class Member were/are paid on piece-rate basis, per class they taught. Generally, classes lasted 45-60 minutes. Defendant also required Plaintiffs and each Class Member to arrive half-hour before class and stay after class to provide feedback to customers.

69.     Upon information and belief, following the training period, Plaintiffs and each Class Member were/are required not only to teach classes, but also perform a variety of other tasks, such as, but not limited to opening/unlocking the studio, setting up the computer systems, answering phones, checking in clients at the front desk, preparing for classes, developing routines, compiling playlists, communicating with customers, attending meetings, and engaging in marketing on behalf of the company, amounting to an approximately 15 to 28 hours per week of work in addition to teaching classes, and Defendant was/is aware of this fact.

70.     Upon information and belief, Plaintiffs and each Class Member was/is required to incur business expenses for items necessary to perform their job, including during the training period, and afterward, which included, but is not limited to making purchases of music and athletic uniforms. Plaintiffs and each Class Member were never compensated or reimbursed for these expenses.

71.     As a result of Defendant's training period scheme, Plaintiffs and each Class Member were not paid the applicable minimum wage for hours Defendant required Plaintiffs and each Class Member to work.

72.     As a result of Defendant's piece-rate compensation scheme, Plaintiffs and each Class

Member that was paid under the piece-rate compensation scheme were not paid at the

applicable overtime rate for hours worked over 40 per week.

73.     As part of its regular business practice, Defendant intentionally, willfully, and

repeatedly engaged in a pattern, practice, and/or policy that violated the FLSA and

NYLL.  Defendant's policy and pattern or practice includes but is not limited to:

      a.     Willfully failing to keep accurate payroll records of its instructors, including
      Plaintiffs and Class Members, as required by the FLSA and NYLL;

      b.     Willfully failing to pay its instructors, including Plaintiffs and Class
      Members, wages at the applicable minimum wage rate;

      c.     Willfully failing to pay its instructors, including Plaintiffs and Class
      Members, wages at the applicable overtime rate;

      c.     Willfully failing to provide its instructors, including Plaintiffs and Class
      Members, accurate wage notices and statements pursuant to N.Y. Lab. Law §§
      195(1) and (3); and

      d.     Willfully failing to compensate or reimburse its instructors, including
      Plaintiffs and Class Members, for purchases of music and athletic uniforms for the
      benefit of Defendant, pursuant to N.Y. Lab. Law § 193.

74.     Defendant is or should have been aware that the FLSA and NYLL required

Defendant to pay Plaintiffs and the Class Members at the applicable minimum wage and/or

overtime rates.

75.     Defendant's failure to pay Plaintiffs and the Class Members wages at the applicable

minimum wage and/or overtime rates, was willful, intentional, and in bad faith.

76.     Defendant failed to provide Plaintiffs and members of the Wage Notice Class with

accurate and proper wage notice pursuant to N.Y. Lab. Law § 195(1).

77.     Defendant failed to provide Plaintiffs and members of the Wage Statement Class

with accurate wage statements pursuant to N.Y. Lab. Law § 195(3).

78.     Defendant failed to compensate or reimburse Plaintiffs and members of the Wage Deduction Class for purchases of music and athletic uniforms Defendant required they make for the benefit of Defendant, pursuant to N.Y. Lab. Law § 195(3).

79.     Defendant's unlawful conduct has been widespread, repeated, and consistent.

## MR. MONTALVO'S FACTUAL ALLEGATIONS

80.     At all times relevant, Mr. Montalvo was an employee of Defendant, working under Defendant's direct supervision, and was classified as non-exempt from the FLSA and the NYLL.

81.     Mr. Montalvo was employed by Defendant from January 29, 2013 to April 5, 2016.

**Wage Notice, Wage Statements and Record-Keeping Requirement Claims**

82.     Defendant failed to furnish Mr. Montalvo with an accurate statement of wages listing hours worked, rates paid, gross wages, allowances and deductions taken, and net wages paid, pursuant to company policy and/or practice.

83.      Defendant failed to furnish Mr. Montalvo with a wage notice at the time of hiring as required by the NYLL, pursuant to company policy and/or practice.

84.     Upon information and belief, Defendant did not keep accurate records of hours worked by and the wages paid to Mr. Montalvo, pursuant to company policy and/or practice.

**Minimum Wage Claims**

85.     During the first approximately seven weeks of employment, from January 29, 2013 to March 17, 2013, Defendant required Mr. Montalvo to perform work pursuant to a training period in the proprietary "Flywheel Method", but failed to compensate Mr. Montalvo at the applicable minimum wage rate, pursuant to company policy and/or practice.

86.     To the best of his recollection, which might be refreshed by review of documents and/or data currently in Defendant's sole possession, Defendant required Mr. Montalvo to

work approximately 23 to 31 hours per week between January 29, 2013 to March 17, 2013,

but failed to compensate Mr. Montalvo at the applicable minimum wage rate, pursuant to

company policy and/or practice.

87.     In addition, Defendant required Mr. Montalvo to incur business expenses during the

training period, including purchases of music and athletic uniforms, for which Defendant did

not compensate or reimburse Mr. Montalvo, pursuant to company policy and/or practice.

**Overtime Claims**

88.     After completing his Flywheel Method "Flybarre" training period, on or about

March 18, 2013 until April 5, 2016, Defendant required Mr. Montalvo to teach "Flybarre"

classes as a instructor, and paid Mr. Montalvo on a piece-rate basis per "Flybarre" class he

taught, anywhere from $75 to $100 per class.

89.     In addition, after a period of training in "Flywheel" class instruction, on or about

June 11, 2015 until April 5, 2016, Defendant required Mr. Montalvo to teach "Flywheel"

classes as a instructor, and paid Mr. Montalvo on a piece-rate basis per "Flywheel" class he

taught, anywhere from $75 to $150 per class.

90.     In addition, between March 18, 2013 and April 5, 2016, Defendant required Mr.

Montalvo to teach private classes, and paid Mr. Montalvo solely on a piece-rate basis per

class he taught at a rate of $75 per class.

91.     On typical weeks, between September 2013 until April 5, 2016, Defendant required

Mr. Montalvo to work over 40 hours per week, but failed to compensate him at the

applicable overtime wage rate, pursuant to company policy and/or practice.

92.     To the best of his recollection, which might be refreshed by review of documents

and/or data currently in Defendant's sole possession, Defendant required Mr. Montalvo to

work more than 40 hours specifically during the weeks of March 24 through June 11, 2015,

18

but failed to compensate Mr. Montalvo for hours worked in excess of 40 at the applicable overtime rate, pursuant to company policy and/or practice.

93.     In addition, Defendant required Mr. Montalvo to incur business expenses during the period of March 18, 2013 until April 5, 2016, including purchases of music and athletic uniforms, for which Defendant did not reimburse Mr. Montalvo, pursuant to company policy and/or practice.

## MS. WOLFE'S FACTUAL ALLEGATIONS

94.     At all times relevant, Ms. Wolfe was an employee of Defendant, working under Defendant's direct supervision, and was classified as non-exempt from the FLSA and the NYLL.

95.     Ms. Wolfe was employed by Defendant from July 24, 2013 until July 29, 2016.

**Wage Notice, Wage Statements and Record-Keeping Requirement Claims**

96.     Defendant failed to furnish Ms. Wolfe with an accurate statement of wages listing hours worked, rates paid, gross wages, allowances and deductions taken, and net wages paid, pursuant to company policy and/or practice.

97.      Defendant failed to furnish Ms. Wolfe with a wage notice at the time of hiring as required by the NYLL, pursuant to company policy and/or practice.

98.     Upon information and belief, Defendant did not keep accurate records of hours worked by and the wages paid to Ms. Wolfe, pursuant to company policy and/or practice.

**Minimum Wage Claims**

99.     During the first approximately eleven weeks of her employment, between August 8, 2013 to October 25, 2013—with the exception of a two week period--Defendant required Ms. Wolfe to perform work pursuant to a training period in the proprietary "Flywheel

Method", but failed to compensate her at the applicable minimum wage rate, pursuant to company policy and/or practice.

100.    To the best of her recollection, which might be refreshed by review of documents and/or data currently in Defendant's sole possession, Defendant required Ms. Wolfe to work approximately 19 to 26 hours per week between August 8, 2013 to October 25, 2013—with the exception of a two week period--but failed to compensate Ms. Wolfe at the applicable minimum wage rate, pursuant to company policy and/or practice.

101.    In addition, Defendant required Ms. Wolfe to incur business expenses during the training period, including purchases of music and athletic uniforms, for which Defendant did not compensate or reimburse her, pursuant to company policy and/or practice.

**Overtime Claims**

102.    After completing her Flywheel Method "Flywheel" training period, on or about October 27, 2013, and until July 29, 2016, Defendant required Ms. Wolfe to teach "Flywheel" classes as a instructor, and paid Ms. Wolfe solely on a piece-rate basis per "Flywheel" class she taught, anywhere from $75 to $150 per class.

103.    On typical weeks between mid-February 2014 until July 29, 2016, Defendant required Ms. Wolfe to work over 40 hours per week, but failed to compensate her at the applicable overtime wage rate, pursuant to company policy and/or practice.

104.    To the best of her recollection, which might be refreshed by review of documents and/or data currently in Defendant's sole possession, Defendant required Ms. Wolfe to work more than 40 hours specifically during the weeks of November 10 through November 29, 2015, but failed to compensate Ms. Wolfe for hours spent in excess of 40 at the applicable overtime rate.

105.    In addition, Defendant required Ms. Wolfe to incur business expenses during the period of October 27, 2013 until July 29, 2016, including purchases of music and athletic uniforms, for which Defendant did not reimburse Ms. Wolfe, pursuant to company policy and/or practice.

**NYCHRL, NYSHRL, and FMLA Violations**

106.    Flywheel Master Instructor Jesse Alexander ("Alexander") physically and verbally sexually harassed Ms. Wolfe on a weekly, sometimes daily basis.

107.    Alexander was assigned by Defendant to train Ms. Wolfe in her role as a spin class instructor; and was Ms. Wolfe's supervisor.

108.    Alexander sexually harassed Ms. Wolfe both in and outside of work.

109.    Alexander's sexual harassment of Ms. Wolfe included, but was not limited to, regular and unwelcome touching of her buttocks and lower back, unwelcome and sexually charged comments toward her, and unwelcome sexual advances made via text message.

110.    For example, during Ms. Wolfe's first encounter with Alexander in a cycling training session on August 11, 2013, Alexander walked to the front of Ms. Wolfe's bike, put his hands on the front of her bike handlebar, leaned in to her face, and said, "That ass looks great in 3rd position."

111.    "Third position" is a Flywheel term of art that requires the cyclist to stand up on their bicycle and push their buttocks out.

112.    After the training session was over, Alexander pulled Ms. Wolfe aside and reprimanded her by saying, "You should always ride without your shirt on. It's sexier." He also said, "I don't know why you women are always so afraid to be sexy." And later, "Don't waste that body."

21

113.     Defendant gave Ms. Wolfe's personal contact information to Alexander, and Alexander immediately used her contact information to further sexually harass Ms. Wolfe.

114.     For example, the very next week after her first training session with Alexander, he began texting Ms. Wolfe unwelcome sexual advances outside of work, including "Hey sexy" and "Sup sexy".

115.     On August 16, 2013, Ms. Wolfe had another training session with Alexander.

116.     While other new hires took turns leading the training session on August 16, Alexander sat on the cycle right next to Ms. Wolfe and made sexually suggestive comments about her appearance.

117.     After the training session on August 16, Alexander pulled Ms. Wolfe aside and again reprimanded her by saying, "I've got big plans for you. You're gonna work that body and get it. Nobody wants to see this white girl shit up there, sex it up and hook 'em. Get your shirt off.  Move! Shake your ass!"

118.     On August 18, 2013, Ms. Wolfe had another training session with Alexander.

119.     During the August 18 training session, Alexander told her, "'Oh! Yes! Take it off, Melis! Time to get sexy!"

120.     At one point during the August 18 training session, Alexander walked over to Ms. Wolfe's bicycle, stood over her, put one hand on her buttocks while she was in third position, and told her to "work it" and then placed his hand over hers on the bicycle handlebar.

121.      On August 19, 2013, Ms. Wolfe had another training session with Alexander.

122.     During the August 19 training session, Alexander told Ms. Wolfe he wanted her to "flaunt that ass on the podium" and to "keep it sexy."

123.    On August 29, 2013, Alexander required that Ms. Wolfe show him a playlist she had

made for class.

124.    After listening, Alexander described the playlist Ms. Wolfe had made as "Garbage"

and "Disney crap" and her told that she needed to be "more X-rated than G-rated."

125.    During this same instance on August 29, Alexander said to Ms. Wolfe, "You're a hot

girl, people are coming for the sex appeal. If you want to build up your class, sports bra is

the way to go."

126.    Starting in September 2013, Alexander increased the frequency of inappropriate texts

to Ms. Wolfe.

127.    For example, Alexander sent Ms. Wolfe an unsolicited and derogatory text about

what he thought of each female instructor, by name.

128.    Such text messages by Alexander included, "[she] used to be cool until she became a

lesbian", and "[she] is a waste of time and a total bitch who should have never been hired".

129.    Alexander also mentioned that Ms. Wolfe should stay away from the male

instructors that "play Disney shit".

130.    Alexander also indicated in his text messages to Ms. Wolfe that he maintained a

close friendship and affinity for Danielle Devine-Baum, Defendant's Northeast Regional

Director, who was responsible for setting the schedules for all instructors in New York City,

including Ms. Wolfe.

131.    Starting in September 2013, Alexander began regularly greeting Ms. Wolfe with a

hand on her buttock; and he would often approach Ms. Wolfe unannounced while she was

studying in the employee lounge by putting his hands on her, including, squatting down

behind her and rubbing her shoulders, or sitting down next to her and rubbing his body on

her.

132.    Starting in September 2013, Alexander started regularly reprimanded Ms. Wolfe after class or during training by stating such things as, "Never ride with your shirt on", and that all she need to do to be good at her job was to "turn up the sex appeal."

**Ms. Wolfe Reports the Sexual Harassment by Alexander**

133.    In late September 2013, Ms. Wolfe attempted to set up a meeting with her direct manager, Kate Hickl to discuss Alexander's sexually harassing behavior toward her.

134.    However, Hickl said she was unable to meet with Ms. Wolfe until the first week in October 2013.

135.    Hickl arranged for the meeting to take place outside the office at a restaurant called Taralucci e Vino in Manhattan in the afternoon.

136.    During the meeting, Ms. Wolfe told Hickl that she was being pressured by Alexander to take off her shirt, that his constant physical touching was upsetting, and that she did not know what to do about his frequent and unwelcome sexual advances via text message.

137.    Ms. Wolfe also showed Hickl a text wherein Alexander had degraded female instructors, including derogatory comments about Hickl and her girlfriend.

138.    When Hickl read the text from Alexander regarding Hickl and her girlfriend, she immediately got up to make a phone call, returned and said, "I will take care of it" and abruptly ended the meeting.

**Ms. Wolfe is Retaliated Against For Reporting Sexual Harassment**

139.    Within an hour of reporting Alexander's sexually harassing conduct to Hickl, Ms. Wolfe received a call from Alexander, but she was too terrified to answer it.

140.    Ms. Wolfe let the call go to voicemail. Alexander left a menacing voicemail saying, "What a piece of shit! I couldn't be angrier with you! Who do you think you are!"

141.    On October 11, 2013, Ms. Wolfe received a text message from Hickl stating that she had notified and was apologizing on behalf of co-Founder Ruth Zukerman and then-CEO/co-Founder Jay Galluzzo regarding Alexander's sexual harassment of Ms. Wolfe, and further, "that [Alexander] was toxic."

142.    On October 11, 2013, Alexander texted Ms. Wolfe, "The amount of time I wasted in trying to help you. Dude. What (sic) I monumental disappointing. Disappointment."

143.    Shortly after reporting Alexander's conduct, one of Alexander's close friends and co-worker, Danielle Devine-Baum, who was in charge of scheduling all instructors in New York City, contacted Ms. Wolfe to set up a meeting on October 19, 2013.

144.    Although Ms. Wolfe and Devine-Baum had not maintained a relationship outside work, suddenly Devine-Baum wanted to meet with Ms. Wolfe, and told Ms. Wolfe the purpose of the meeting was to, "just hang outside of Fly for a bit and chat".

145.    Upon information and belief, Devine-Baum was Ms. Wolfe's supervisor, and had the ability to hire, fire, and discipline Defendant's employees.

146.    Aside from handling Ms. Wolfe's hiring paperwork and scheduling Ms. Wolfe for classes, Devine-Baum and Ms. Wolfe did not usually interact at work.

147.    Devine-Baum arranged for the meeting with Ms. Wolfe to take place at Coffee Bean & Tea Leaf in Manhattan.

148.    Although Ms. Wolfe had not told Devine-Baum that she reported Alexander for sexually harassing her, Devine-Baum started the meeting by insinuating that Ms. Wolfe had reported being sexually harassed by Alexander.

149.    Ms. Wolfe attempted to go through the many of the instances of sexual harassment by Alexander with Devine-Baum at the meeting, but Devine-Baum cut her off, saying "there's so much excitement during training, and it can be really stressful, so I understand

that sometimes perception can get a little, you know, blurry. You should just try to relax and move on."

150.    After the meeting with Devine-Baum, Alexander's conduct toward Ms. Wolfe became more erratic and bizarre.

151.    For example, when passing Ms. Wolfe at work, Alexander would often mutter derogatory comments about Ms. Wolfe under his breath or roll his eyes at her.

152.    On October 24, 2013, Ms. Wolfe again reported Alexander's harassing conduct to Hickl in a text message. However, this text went unanswered.

153.    In late-October 2013, Ms. Wolfe received her first teaching schedule from Devine-Baum.

154.    While others in her training group had been assigned to teach multiple classes per week, Ms. Wolfe was distressed to learn that not only had Devine-Baum scheduled her to teach only one class per week, but that Devine-Baum had scheduled Ms. Wolfe to teach at a time either right before or right after Alexander's classes.

155.    For example, on October 27, 2013, Devine-Baum started scheduling Ms. Wolfe for the 7:30 a.m. class in Defendant's Flatiron studio, and Alexander was scheduled for the very next class after Ms. Wolfe's class.

156.    As a result, each time she taught, Ms. Wolfe had to face her harasser, Alexander, in passing, who would mutter things under his breath to her, such as, "I can't fucking believe this".

157.    Further, Ms. Wolfe discovered that Alexander was sabotaging Ms. Wolfe's class attendance by bad-mouthing her to other customers.

158.     For example, a week before Ms. Wolfe was scheduled to substitute for one of Alexander's classes, Ms. Wolfe overheard Alexander telling a customer at Flywheel, "don't waste your time. It's this one [motioning towards Ms. Wolfe]. Waste of fuckin' time."

159.     In late October 2013, Ms. Wolfe contacted Devine-Baum regarding the interactions with Alexander that Devine-Baum had brought upon Ms. Wolfe after they spoke about Alexander sexually harassing her.

160.     However, Devine-Baum was evasive and refused to meet with Ms. Wolfe in the workplace.

161.     Finally, on October 25, 2013, Devine-Baum said Ms. Wolfe could meet her outside of work at another gym called As One.

162.     Having no other choice, Ms. Wolfe attended the As One class to meet with Devine-Baum to discuss the retaliation she was facing as a result of reporting sexual harassment, including Devine-Baum's decision to schedule her immediately before or after Alexander's classes.

163.     However, Devine-Baum ignored Ms. Wolfe during the As One class, and had brought her husband along to the class, making it awkward for Ms. Wolfe to bring up the way Alexander was treating Ms. Wolfe in front of Devine-Baum's husband.

164.     Again, in early November 2013, Plaintiff Wolfe contacted Devine-Baum regarding the scheduling problems Devine-Baum had caused after they spoke about Alexander sexually harassing her.

165.     Devine-Baum evaded Plaintiff Wolfe's request for a meeting, so Plaintiff Wolfe approached her at Defendant's studio in the Upper East Side to have an impromptu meeting.

166.     At the impromptu meeting, Ms. Wolfe explained to Devine-Baum that she felt extremely uncomfortable having her classes scheduled immediately before or after

Alexander's because of his sexually harassing conduct, and that Alexander was sabotaging her class attendance by waiting around before her classes began to bad-mouth her to customers.

167.    Despite Ms. Wolfe's concerns, Devine-Baum refused to schedule Ms. Wolfe for other classes, even though other classes were available.

168.    Instead, Devine-Baum claimed ignorance regarding the sexually harassing conduct by Alexander, and told Ms. Wolfe, "You need to earn your client base by providing a good class, not by worrying about what Jesse [Alexander] was saying."

169.    Flywheel Front Desk Coordinator, Rhisa Parera, regularly witnessed Alexander bad-mouthing Ms. Wolfe outside of class to other customers, or making derogatory comments toward Ms. Wolfe.

170.    In a declaration executed July 29, 2016, and annexed hereto as Exhibit B and incorporated herein, Parera states the following:

> For example, in November 2013, at the Flatiron Flywheel studio, while working behind the front desk, I witnessed Alexander approaching the door to the class that Wolfe had just finished teaching, saying to two other female customers, " I don't know why these women would take this bitch's class," referring to Wolfe's class that was just ending.  I witnessed Alexander make this type of derogatory comment about Wolfe or Wolfe's class to others, or to Wolfe herself after nearly every class Wolfe taught, until he was terminated in July 2015.

171.    Shortly after contacting Devine-Baum regarding the scheduling issues in November 2013, Ms. Wolfe again contacted Hickl to ask her what she should do regarding Alexander's continued harassment and Devine-Baum's scheduling changes in retaliation for reporting sexual harassment.

172.    Hickl responded to Ms. Wolfe that she would speak with Zukerman, and that "action had already been taken."

28

173.    In mid-November 2013, despite Devine-Baum scheduling each instructor of Ms.

Wolfe's training group for multiple classes per week, and some receiving permanent

schedules, Devine-Baum was scheduling Ms. Wolfe for only one class per week, even

though additional classes were available and Ms. Wolfe was willing to instruct those classes.

174.    For example, during November 2013, one instructor from Ms. Wolfe's training

group was being scheduled for 14 classes per week, which she informed Ms. Wolfe was too

many for her to handle and she felt over-worked, as a result.

175.    In fact, Devine-Baum would send out weekly e-mails to the group of instructors

informing them of available opportunities to teach class, and Ms. Wolfe would reply to each

saying that she was available to teach class.

176.    However, Ms. Wolfe was not regularly scheduled for any additional classes by

Devine-Baum.

177.    When Ms. Wolfe asked Devine-Baum why she was only being scheduled for one

class per week, while her peers were regularly being scheduled for multiple classes per

week, Devine-Baum told Ms. Wolfe that she did not have any feedback for her, and that her

performance was satisfactory.

178.    After pressing further, Devine-Baum said that Ms. Wolfe did not have enough

experience using the microphone to lead her classes.

179.    Ms. Wolfe asked Devine-Baum how she was supposed to gain experience using the

microphone if she was not being scheduled to teach classes.

180.    In response, Devine-Baum told Ms. Wolfe, "You need to wait."

181.    In December 2013, Ms. Wolfe approached Devine-Baum again to ask why she was

still not being scheduled for as many classes as others in her training group.

182.    Devine-Baum said to Ms. Wolfe that there was no problem with her performance, and that "you are exactly where you need to be."

183.    Later that day, Ms. Wolfe inquired further of Devine-Baum as to why Devine-Baum was not scheduling her for classes.

184.    Devine-Baum called Ms. Wolfe back at around 8:30 p.m. and said, "It's best if you learn to keep your mouth shut. Just mind your own business."

185.    In mid-December 2013, Ms. Wolfe was given her first performance review.

186.    Ms. Wolfe's performance review was conducted by Devine-Baum and another Flywheel instructor, John Wellman.

187.    Ms. Wolfe was shocked to learn that after being told repeatedly that her performance was satisfactory over the course of her employment, and despite that Devine-Baum had no feedback for her to improve, and despite the fact that neither reviewer had ever attended her classes, and in fact, turned down Ms. Wolfe's requests for them to attend her class so she could receive feedback, she was given a 64 out of 100 on her performance review.

188.    "N/A" was written on each area of Ms. Wolfe's performance review that called for elaboration on areas of improvement.

189.    Puzzled by this lack of feedback, Ms. Wolfe asked why she received a 64 out of 100.

190.    Ms. Wolfe was told that she received a 64 out of 100 on her performance review solely because she placed her bag and shoes in the employee office, instead of in a locker; and because she was once a few minutes late to class due to a transportation delay.

191.    In response to the issue that she had placed her bag and shoes in the wrong location, Ms. Wolfe explained that she was just following the instruction of other senior instructors, and that no one had ever warned her that this was not the correct location to put her bag and shoes.

192.    In response to the issue that Ms. Wolfe was a few minutes late for class once, she

explained that the delay was caused by the fact that a subway was running behind while

returning from helping Defendant's customer with a hospital stay that was necessitated after

attending Defendant's class. After the customer started feeling ill during Defendant's class,

Ms. Wolfe helped the customer to the hospital, and stayed with the customer overnight in

the hospital. Ms. Wolfe and the customer bonded through the process.  In fact, Defendant

was generally aware of how Ms. Wolfe had helped the customer, and Defendant arranged a

complimentary membership for the customer, and it was rumored that Defendant considered

installing a bicycle in the customer's apartment.  Defendant's media team even posted a blog

on their website boasting about how Ms. Wolfe had helped the customer. The blog quoted

the customer, and a photo was taken for promotional purposes of Ms. Wolfe and the

customer together:

> "My friendship with instructor Melissa Wolfe is the most incredible thing to come
> from Flywheel. When I'm too sick to make it to class, Melissa has sent me her playlist so
> that I can listen along from home. During a weeklong hospital stay earlier this year, Melissa
> was with me every day and overnight. Knowing that I wanted to be at Flywheel instead of in
> a hospital bed, she helped me to walk laps and do barre exercises around the oncology floor.
> Weeks after being discharged, once I finally was well enough to return to Melissa's class, it
> felt like a huge success! A month earlier she and I were slowly towing my IV pole around
> the hospital, and now I was back on the bike with her. Sharing the lows of my illness with
> Melissa makes the ups that much sweeter, and her class is where I work the hardest and have
> the most fun! I couldn't have predicted meeting one of my closest friends through
> Flywheel."



193.    However, Devine-Baum used this instance against Ms. Wolfe to punish her and attempt to push her out by issuing her a sham performance review, while at the same time benefitting from the goodwill Ms. Wolfe created for the company, and boasting of it on Defendant's website to attract more customers.

194.    In January 2014, Ms. Wolfe had a technical issue with Defendant's studio sound system during her class.

195.    Alexander was scheduled to teach the following class, and Ms. Wolfe politely told him that the sound system wasn't functioning correctly.

196.    In response, Alexander mumbled back, "Fucking don't."

197.    Afterward, Ms. Wolfe reported the incident to Devine-Baum, and explained that she continued to feel very uncomfortable being scheduled for classes right after or right before Alexander's classes.

198.    In response to reporting the continued harassment by Alexander, Devine-Baum threatened Ms. Wolfe by saying, "there are no other classes available and if you chose not to teach that time slot, I will not guarantee there is another."

199.    On February 5, 2014, Ms. Wolfe e-mailed Zukerman to discuss the way Alexander had been treating her since she reported that he was sexually harassing her, and had been retaliated by Devine-Baum.

200.    On February 10, 2014, Ms. Wolfe and Zukerman met. Plaintiff Wolfe explained to Zukerman that she continued to feel that Devine-Baum was retaliating against her for reporting sexual harassment by Alexander, who was a close personal friend of Devine-Baum, by giving Ms. Wolfe only one class per week, scheduling her classes to be immediately before or after Alexander's, telling Plaintiff her performance was satisfactory, yet rating her a 64 out of 100 on her performance review.

201.    In response, Zukerman stated, "This is a known problem." Zukerman further stated, "there is no need for empathy for Danielle [Devine-Baum], the way she targets staff has been brought up before and will be addressed again."

202.    Zukerman also stated, "Jesse [Alexander] is a long-term and successful part of fly-fam. This does not excuse his actions. But, I want to do right by him."

203.    In retaliation for reporting Devine-Baum to Zukerman, Devine-Baum began scheduling Ms. Wolfe an impossible schedule of classes to teach in order to push her out of the company.

204.    After reporting to Zukerman, Devine-Baum changed Ms. Wolfe's schedule to teach seven days per week, for several months, including the last class of the day, followed by the first class of the next morning, approximately three to four days per week.

205.    No other instructor had been given a schedule such as Ms. Wolfe's.

206.    In fact, when Ms. Wolfe's schedule was posted online for all co-workers to see, many of Ms. Wolfe's co-workers commented that the schedule was "crazy" and that they would never physically be able to work such a grueling schedule.

207.    Ms. Wolfe now labored under a seven-day-per-week schedule, on top of running into Alexander in-between classes, who continued to mumble things under his breath as they passed.

208.    In late-March, early-April 2014, while working at Defendant's Lincoln Square location, Ms. Wolfe encountered Zukerman in passing.

209.    During that interaction, Ms. Wolfe reported to Zukerman the continued inappropriate behavior by Alexander, and the continued retaliation by Devine-Baum.

210.    In response, Zukerman stated, "O.K., thanks, Wendy", and walked away.

211.    Another co-worker overheard the interaction, and later asked Ms. Wolfe, "Did she just call you Wendy?"

212.    In Spring 2014, Ms. Wolfe contacted Kayle Powers, Defendant's Human Resources Manager, to report the continued sexual harassment and retaliation.

213.    During her conversation with Powers, Ms. Wolfe detailed at length the history of sexual harassment by Alexander, and how her work schedule was affected thereafter by Devine-Baum, including first being regularly scheduled only one day a week, then after complaining to Zukerman, being regularly scheduled seven days per week for several months, as well as being punished in the performance review, despite being told her performance had been satisfactory up until then.

214.    In response, Powers warned her that given the serious nature of the "accusations", Ms. Wolfe's complaint and name would be shared with her harassers.

215.    Thereafter, on May 9, 2014, after teaching a class at Defendant's Lincoln Square location, Ms. Wolfe saw she had a voicemail from Devine-Baum. The voicemail from Devine-Baum stated,  "I don't feel this is a healthy job for you, and I am removing you from the schedule."

216.    Ms. Wolfe called Devine-Baum back to ask why she was being removed from the schedule.

217.    Devine-Baum stated that she had seen a post on Ms. Wolfe's Facebook wherein she asked for a recommendation for a chiropractor, and that Devine-Baum "couldn't have instructors posting on Facebook that they need medical care." Devine-Baum further stated, "I don't want to hear your opinion. This is non-negotiable."

218.    At 4:40pm on May 9, 2014, Devine-Baum e-mailed Ms. Wolfe the following:

May 9, 2014, às 4:40 PM, Danielle Devine-Baum ddevine@flywheelsports.com escreveu:

Hi Melissa-

I just left you a voicemail, but we are going to require a doctor's note for you to teach.

We are subbing out your classes tomorrow, and putting instructors on call for your classes on Sunday in case you happen to be able to get a note tomorrow.

Thanks,
DDB

Danielle Devine-Baum
Flywheel Sports
ddevine@flywheelsports.com
O: 212-242-9433

219.    In response, Ms. Wolfe e-mailed Devine-Baum the following:

On May 9, 2014, at 6:00 PM, Melissa Wolfe <mwolfe@flywheelsports.com> wrote:

Hi Danielle,

I'm getting a doctors note for you right now & would like to teach tomorrow. I am cleared & well, & not I. the financial position to lose the classes.

Please let me know.

Thanks!

220.    Ms. Wolfe was perplexed as to why she was now being required to provide a doctor's note so that she could be put back on the schedule.

221.    Ms. Wolfe contacted Hickl and one of Defendant's human resources representatives to inquire why a doctor's note now being required of her in order to be put back on the schedule.

222.    Hickl did not immediately respond to Ms. Wolfe.

223.    Defendant's human resources representative told Ms. Wolfe that she could not over ride Devine-Baum's judgment call, and instructed her to visit a doctor, undergo an examination and to get a note that she was clear to work.

224.    Ms. Wolfe found a doctor that same day, and he wrote Ms. Wolfe a letter clearing her for work. Ms. Wolfe submitted the letter to Defendant later that evening.

225.    However, Ms. Wolfe was not allowed to teach her scheduled classes that day.

226.    From approximately late-February to early September 2014, Ms. Wolfe had been regularly scheduled, seven days per week.

227.    On numerous occasions Ms. Wolfe asked Devine-Baum for one regular day off per week, but these requests were regularly rejected.

228.    At the same time, Ms. Wolfe's co-workers were granted regularly scheduled days off or schedule changes.

229.    On July 20, 2014, Ms. Wolfe explained to Hickl that she had been regularly scheduled to teach seven days per week for several months.

230.    Fearing for her job, Ms. Wolfe asked Hickl if she thought she was on good enough terms with Devine-Baum to ask Devine-Baum for a regular day off per week.

231.    In response, Hickl advised Ms. Wolfe to request a day off.

232.    On July 21, 2014, after having been regularly scheduled for seven days per week, for several months, Ms. Wolfe requested that Devine-Baum regularly schedule her one day off per week moving forward.

233.    Devine-Baum did not answer Ms. Wolfe's e-mail.

234.    Ms. Wolfe followed up with another e-mail to Devine-Baum requesting she regularly schedule Ms. Wolfe one day off per week moving forward.

235.    Again, Devine-Baum did not answer Ms. Wolfe's e-mail.

236.    On August 4, 2014, Ms. Wolfe e-mailed Hickl to explain that her request to be regularly scheduled one day off per week was being ignored by Devine-Baum. Ms. Wolfe asked Hickl what to do next, saying,

> I feel like I'm never going to get myself out of the hole with her. cc'ing Ruth is just going to dig it even deeper & ultimately I'm pretty much at her mercy re: my job. I feel like it continues to leave me walking on eggshells if I speak up.

237.    Hickl told Ms. Wolfe to e-mail Devine-Baum again, and this time carbon-copy Zukerman.

238.    On August 14, 2014, Ms. Wolfe e-mailed Devine-Baum and carbon-copied Zukerman, per Hickl's instructions.

239.    Shortly after the August 14 e-mail, Devine-Baum replied to Ms. Wolfe. Devine-Baum stated that Ms. Wolfe had not been clear in stating that she wanted a regularly scheduled day off, and that she should have "double confirmed", despite the fact that she had made numerous requests for a regularly scheduled day off per week. After this, Devine-Baum finally granted a six-day per week schedule to Ms. Wolfe.

**Ms. Wolfe Disclosed to Zukerman She Had Breast Cancer**

37

240.    On or about November 2014, Ms.Wolfe privately disclosed to Zukerman that she

had been diagnosed with breast cancer via e-mail, and requested leave from two classes per

week, for three weeks, while Ms. Wolfe underwent radiation treatment for the cancer.

241.    Instead of receiving a response from Zukerman, Ms. Wolfe received a response from

Devine-Baum on November 20, 2014, wherein Devine-Baum carbon-copied Rachel

Zukerman, a Flywheel Development Coordinator, stating the following:

> **Re:** Chelsea classes
>
> **Date:** 11.20.2014 17:09
>
> **From:** Danielle Devine-Baum danielle@flywheelsports.com
>
> **To:** Melissa Wolfe mwolfe@flywheelsports.com
>
> **Cc:** Rachel Zukerman <Rachel@flywheelsports.com>
>
> Hi Melissa-
>
> Ruth passed along to me your desire to drop your Tues/Thurs Chelsea 730 PM slots.
> We are going to be able to cover those for you ASAP (Rachel can confirm the start
> date). I believe you had also requested to get the slots back after the holidays but we
> can not guarantee that will happen as we will be reassigning them.
>
> Thanks,
> DDB
>
> Danielle Devine-Baum
> Flywheel Sports
> danielle@flywheelsports.com
> O:  (646) 661-7393 ext 252

242.    On November 24, 2014, Ms. Wolfe e-mailed Defendant's Human Resources

Manager, Kayle Powers, reiterating the history of sexual harassment and retaliation by

Alexander, the retaliation by Devine-Baum, as well as Zukerman's failure to even

acknowledge her request to take off two classes per week, for three weeks, so she could manager her breast cancer radiation treatment.

243.    Powers responded that she was unaware of Alexander's conduct toward Plaintiff Wolfe.

244.    Plaintiff Wolfe replied to Powers stating that Alexander's conduct had persisted since August 11, 2013, and had not been effectively remediated.

245.    Powers did not follow up further regarding Alexander's conduct toward Plaintiff Wolfe.

246.    Powers informed Plaintiff Wolfe that she could take off two classes per week, for three weeks to attend to radiation therapy.

247.    On November 25, 2014, having not received a reply from Zukerman regarding her request for leave to manage her breast cancer radiation treatment, Ms. Wolfe requested another meeting with Zukerman to discuss how her request had been handled.

248.    On November 25, 2014, Zukerman set up a meeting between herself, Ms. Wolfe, and then-CEO and co-Founder Jay Galluzzo to "address all your concerns with Flywheel".

249.    At the meeting, Zukerman denied ever receiving an e-mail regarding Ms. Wolfe's breast cancer and her request for time off, despite acknowledging that Zukerman had told Devine-Baum to speak with Ms. Wolfe regarding her request for two classes off per week, for three weeks.

250.    Zukerman looked embarrassed when Ms. Wolfe showed Zukerman and Galluzzo the e-mail she had sent to Zukerman in which she described her breast cancer and need for radiation treatment, and her request for two classes off per week, for three weeks.

251.    Galluzzo jumped in to defend Zukerman by saying, "Since I don't even work here anymore, I have the pleasure of being able to say really whatever I want. Ruth gets so many e-mails every day, she really doesn't have time for all the drama from you instructors."

252.    Thereafter, Galluzzo and Zukerman took turns berating Ms. Wolfe.

253.    First, Galluzzo and Zukerman chastised Ms. Wolfe for not wanting to make her cancer public. Zukerman criticized Ms. Wolfe, saying 'it is absurd to say that you don't want people to know that you have cancer".

254.    Thereafter, Galluzzo and Zukerman took turns mocking Ms. Wolfe's request for time off to manage her breast cancer by doing impressions of instructors who they found annoying. Using two instructors as examples, in high pitched, crying voices, they said, "I'm Holly Rilinger and I'm leaving town tomorrow for Nike so cover my classes! My name is Kate Hickl, I'm a diva and I refuse to teach at studios where the sound system makes me strain my vocal cords."

255.    After laughing at each other's impressions, Galluzzo resumed telling Ms. Wolfe that she couldn't expect Zukerman to have time to help her whenever she needed it.

256.    On December 12, 2014, Ms. Wolfe taught a 12:30 p.m. class at Defendant's Lincoln Square location.

257.    Immediately after the class, Defendant's Human Resources Manager, Kayle Powers e-mailed Ms. Wolfe, asking her to call, and thereafter, Ms. Wolfe called Powers.

258.    Powers informed Ms. Wolfe by phone that the Chief Marketing Officer, Tamara Odinec, had been in her 12:30 p.m. class, and called Defendant's Human Resources afterward to say that Ms. Wolfe "looked too ill to be teaching classes."

259.    Thereafter, Powers asked Ms. Wolfe if the cancer was affecting her ability to perform her job.

260.    Ms. Wolfe replied that she was healthy enough to be teaching classes, and was offended by Odinec's suggestion that she was "too ill to be teaching classes", and questioned Powers regarding how Odinec knew Ms. Wolfe had breast cancer.

261.    Powers disregarded Ms. Wolfe's concerns, and instead chided her for allegedly talking with others about how Zukerman and Galluzzo treated her during the late-November 2014 meeting, saying, "We can't have anyone talking badly about our founder".

262.    On December 4, 2014, Devine-Baum e-mailed all instructors that she would not be conducting annual performance reviews for 2014.

263.    On July 14, 2015, Ms. Wolfe received the following e-mail from Zukerman:

> Instructors,
>
> As some of you might be aware, Jesse Alexander is no longer with Flywheel. We thank him for a wonderful five years and wish him the best of luck in the future. As employees of the company, we ask that you all refrain from posting about this or commenting on social media. If you have any questions, please feel free to contact us in the office tomorrow.
>
> Best,
> Ruth & Dana

264.    On March 31, 2016, Ms. Wolfe had a meeting with her new Instructor Coordinators, Jaimie Bailey and Kara Bocchi. They informed Ms. Wolfe that they were reducing her regular class schedule to 11 classes per week, and added, " We know you've had some medical issues in the past, so we really think this will actually be better for you."

265.    On June 1, 2016, Ms. Wolfe learned from two co-workers that Plaintiff Wolfe was being terminated.

266.    At 12:30 p.m., on June 1, 2016, Ms. Wolfe texted Jaimie Bailey, to ask why her co-workers were under the impression she was being terminated.

267.    Shortly thereafter, Bailey and Ms. Wolfe spoke by phone. Bailey denied knowing

anything regarding any plans to terminate Ms. Wolfe.

268.    Around 11:00 p.m., Ms. Wolfe received an e-mail from Bailey, carbon-copying

Devine-Baum, that stated the following:

> Hey Melissa! I just wanted to reach out to you about our conversation from earlier
> this afternoon as Danielle and I are concerned as to why anyone other than DDB or
> myself would be discussing your standing in the company. Clearly these rumors are
> misguided and misinformed. Please keep me looped in if any of this comes up again
> at any point. Talk to you Friday!

269.    On June 3, 2016, Bailey and Ms. Wolfe had a phone call to discuss new customer

attendance quotas for Ms. Wolfe that pertained to Defendant's use of an app called

ClassPass.

270.    Under the new customer attendance quota program, Defendant's customers using

ClassPass could attend Ms. Wolfe's class at a discounted rate, instead of paying the regular

rate of $34 per class.

271.    However, Ms. Wolfe did not have control over how many ClassPass spaces were

available in her classes.

272.    As a result, given the choice between paying the regular $34 per class rate, and the

discounted ClassPass rate, many customers opted to sign up for Ms. Wolfe's class vis-à-vis

ClassPass, or if all of Ms. Wolfe's ClassPass spaces were full, many customers opted to take

a different class with open ClassPass spaces.

273.    Despite Defendant having sole control over how many ClassPass spaces were

available in Ms. Wolfe's classes, Bailey suddenly required Ms. Wolfe to increase her non-

ClassPass customer attendance by 30% in 30 days.

274.    Ms. Wolfe responded to Bailey that it was impossible to meet those customer

attendance quotas because her $34 classes were now competing with classes that cost less

vis a vis ClassPass, but made diligent efforts to meet the new customer attendance quotas.

275.    On June 14, 2016, Bailey e-mailed Ms. Wolfe to set up another date to discuss her

customer attendance quotas on June 16, 2016, along with Defendant's Human Resources

Director, Melanie Luftman.

276.    At the June 16, 2016 meeting between Luftman, Bailey and Ms. Wolfe, Bailey told

Ms. Wolfe she was being terminated, and thereafter terminated Ms. Wolfe on July 29, 2016.

277.    Over the course of her employment, Ms. Wolfe has suffered anxiety, depression,

fatigue, loss of self-confidence, and sleeplessness, as a result of Alexander's sexual

harassment, Devine-Baum's retaliation, and both Zukerman's and Galluzzo's conduct in

handling and disclosing her confidential and sensitive medical information to employees

without a business need to know, among other unlawful conduct by Defendant.

### FIRST CAUSE OF ACTION
**(FLSA – Failure to Pay Wages at the Applicable Minimum Wage Rate)**
**As to Plaintiffs and the FLSA Collective**

278.    Plaintiffs, on behalf of themselves and the FLSA Collective, realleges and

incorporates by reference each allegation in the foregoing paragraphs as though fully set

forth herein.

279.    Plaintiffs and the members of the FLSA Collective are non-exempt employees

entitled to be paid at least the applicable federal minimum wage for all hours worked.

280.    Defendant employed Plaintiffs and the members of the FLSA Collective, but failed

to pay them at the applicable minimum wage.

281.    Defendant required Plaintiffs and the members of the FLSA Collective to pay for the

tools of the trade, but failed to compensate or reimburse them.

282.    Defendant failed to keep accurate records of time worked by Plaintiffs and the members of the FLSA Collective.

283.    Defendant's violations of the FLSA, as described in this Complaint have been willful and intentional.

284.    Defendant did not make a good faith effort to comply with the FLSA with respect to its compensation to Plaintiffs and the FLSA Collective.

285.    Because Defendant's violations of the FLSA were willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

286.    Plaintiffs has expressed their consent to make these claims against Defendant by filing a written consent form, pursuant to 29 U.S.C. § 216(b).

287.    As a consequence of the willful underpayment of wages, alleged above, Plaintiffs has incurred damages thereby and the Defendant is indebted to them in the amount of the unpaid minimum wage and overtime compensation, together with interest, liquidated damages, attorneys' fees, and costs in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (FLSA – Failure to Pay Wages at the Applicable Overtime Rates) As to Plaintiffs and the FLSA Collective

288.    Plaintiffs, on behalf of themselves and the FLSA Collective, realleges and incorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

289.    Plaintiffs and the members of the FLSA Collective are non-exempt employees entitled to be paid at the applicable overtime rate for all hours worked over 40 in a workweek.

290.    Defendant employed Plaintiffs and the members of the FLSA Collective, but failed to pay them at the applicable overtime rate for hours worked over 40 in a workweek.

291.     Defendant required Plaintiffs and the members of the FLSA Collective to pay for the tools of the trade, but failed to compensate or reimburse them.

292.     Defendant failed to keep accurate records of time worked by Plaintiffs and the members of the FLSA Collective.

293.     Defendant's violations of the FLSA, as described in this Complaint, have been willful and intentional.

294.     Defendant did not make a good faith effort to comply with the FLSA with respect to its compensation to Plaintiff and the FLSA Collective.

295.     Because Defendant's violations of the FLSA were willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

296.     Plaintiffs has expressed their consent to make these claims against Defendant by filing a written consent form, pursuant to 29 U.S.C. § 216(b).

297.     As a consequence of the willful underpayment of wages, alleged above, Plaintiffs have incurred damages thereby and the Defendant is indebted to them in the amount of the unpaid minimum wage and overtime compensation, together with interest, liquidated damages, attorneys' fees, and costs in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (NYLL- Failure to Pay Wages at the Applicable Minimum Wage Rate)
### As to Plaintiffs and the New York Class

298.     Plaintiffs, on behalf of themselves and the New York Class, realleges and incorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

299.     Defendant employed Plaintiffs and the members of the New York Class, and willfully failed to compensate Plaintiffs and the members of the New York Class at the applicable minimum wage rate, in violation of the requirements of NYLL.

300.   By the course of conduct set forth above, Defendant has violated N.Y. Lab. Law §

650 *et seq.*; 12 N.Y.C.R.R. § 142 *et seq.*

301.   Defendant failed to keep, make, preserve, maintain and furnish accurate records of

time worked by Plaintiffs and the members of the New York Class.

302.    Defendant required Plaintiffs and the members of the Wage Deduction Class to pay

for the tools of the trade, but failed to compensate or reimburse them.

303.   Defendant has a policy and practice of refusing to pay the applicable minimum wage

rate to Plaintiffs and the members of the New York Class.

304.   Defendant's failure to pay the minimum wage rate to Plaintiffs and the members of

the New York Class was willful within the meaning of N.Y. Lab. Law § 663.

305.   As a consequence of the willful failure to pay wages at the minimum wage rate,

alleged above, Plaintiffs and the members of the New York Class have incurred damages

thereby and the Defendant is indebted to them in the amount of the unpaid wages, and such

other legal and equitable relief due to Defendant's unlawful and willful conduct, as the

Court deems just and proper.

306.   Plaintiffs', on behalf of themselves and the members of the New York Class, seeks

recovery of liquidated damages, attorneys' fees, interest, and costs to be paid by the

Defendant as provided by the NYLL.

### FOURTH CAUSE OF ACTION
**(NYLL- Failure to Pay Wages at the Applicable Overtime Rates)**
**As to Plaintiffs and the New York Class**

307.    Plaintiffs, on behalf of themselves and the New York Class, realleges and

incorporates by reference each allegation in the foregoing paragraphs as though fully set

forth herein.

308.    Defendant employed Plaintiffs and the members of the New York Class, and willfully failed to compensate Plaintiffs and the members of the New York Class at the applicable overtime rates, in violation of the requirements of NYLL.

309.    By the course of conduct set forth above, Defendant has violated N.Y. Lab. Law § 650 *et seq.*; 12 N.Y.C.R.R. § 142 *et seq.*

310.    Defendant failed to keep, make, preserve, maintain and furnish accurate records of time worked by Plaintiffs and the members of the New York Class.

311.    Defendant required Plaintiffs and the members of the Wage Deduction Class to pay for the tools of the trade, but failed to compensate or reimburse them.

312.    Defendant has a policy and practice of refusing to pay the applicable overtime rate to Plaintiffs and the members of the New York Class for hours worked over 40 in a workweek.

313.    Defendant's failure to pay the applicable overtime rate to Plaintiffs and the members of the New York Class was willful within the meaning of N.Y. Lab. Law § 663.

314.    As a consequence of the willful failure to pay the applicable overtime rate, alleged above, Plaintiffs and the members of the New York Class have incurred damages thereby and the Defendant is indebted to them in the amount of the unpaid wages, and such other legal and equitable relief due to Defendant's unlawful and willful conduct, as the Court deems just and proper.

315.    Plaintiffs', on behalf of themselves and the members of the New York Class, seeks recovery of liquidated damages, attorneys' fees, interest, and costs to be paid by the Defendant as provided by the NYLL.

**FIFTH CAUSE OF ACTION**
**(NYLL – Violation of Wage Notice and Statement, and Record-Keeping Requirements)**
**As to Plaintiffs and the Wage Notice and Wage Statement Class**

316.    Plaintiffs, on behalf of themselves and the Wage Notice and Wage Statement Class, realleges and incorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

317.    Defendant failed to supply Plaintiffs and the members of the Wage Notice Class notice as required by N.Y. Lab. Law § 195, in English or in the language identified by Plaintiffs and the members of the Wage Notice Class as their primary language, containing Plaintiffs' and the members of the Wage Notice Class' rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; hourly rate or rates of pay and overtime rate or rates of pay if applicable; the regular pay day designated by the employer in accordance with N.Y. Lab. Law § 191; the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer; plus such other information as the commissioner deems material and necessary.

318.    Defendant failed to supply Plaintiffs and the members of the Wage Statement Class with an accurate statement of wages as required by N.Y. Lab. Law § 195, containing the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; hourly rate or rates of pay and overtime rate or rates of pay if applicable; the number of hours worked, including overtime hours worked if applicable; deductions; and net wages.

319.    Due to Defendant's violations of N.Y. Lab. Law § 195, for each workweek that Defendant failed to provide a proper wage notice at the time of hiring from April 9, 2011 through February 26, 2015, Plaintiffs and members of the Wage Notice Class are each

48

entitled to damages of $50, or a total of $2,500 per class member, as provided for by N.Y. Lab. Law § 198, reasonable attorneys' fees, costs, and injunctive and declaratory relief.

320.    Due to Defendant's violations of N.Y. Lab. Law § 195, for each day that Defendant failed to provide a proper wage notice at the time of hiring from February 26, 2015 through the present, Plaintiffs and members of the Wage Notice Class are entitled to damages of $50, or a total of $5,000 per class member, as provided for by N.Y. Lab. Law § 198, reasonable attorneys' fees, costs, and injunctive and declaratory relief.

321.    Due to Defendant's violations of N.Y. Lab. Law § 195, for each workweek that Defendant failed to provide a proper wage statement from April 9, 2011 through February 26, 2015, Plaintiffs and members of the Wage Statement Class are each entitled to damages of $100, or a total of $2,500 per class member, as provided for by N.Y. Lab. Law § 198, reasonable attorneys' fees, costs, and injunctive and declaratory relief.

322.    Due to Defendant's violations of N.Y. Lab. Law § 195, for each workweek that Defendant failed to provide a proper wage statement from February 26, 2015 through the present, Plaintiffs and members of the Wage Statement Class are each entitled to damages of $250, or a total of $5,000 per class member, as provided for by N.Y. Lab. Law § 198, reasonable attorneys' fees, costs, and injunctive and declaratory relief.

### SIXTH CAUSE OF ACTION
### (NYLL – Unlawful Wage Deductions)
### As to Plaintiffs and the Wage Deduction Class

323.    Plaintiffs, on behalf of themselves and the Wage Deduction Class, realleges and incorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

324.    Defendant knowingly, willfully, and intentionally violated N.Y. Lab. Law § 193 when Defendant required Plaintiffs and the Wage Deduction Class to purchase music and

athletic uniforms for Defendant's benefit and without compensation or reimbursement, as a company policy and/or practice.

325.    This policy and/or practice constituted an unlawful deduction of Plaintiffs' and the Wage Deduction Class' wages.

326.    As a consequence of the willful underpayment of wages, alleged above, Plaintiffs and the Wage Deduction Class incurred damages thereby and Defendant is indebted to Plaintiffs and the Wage Deduction Class in the amount of the purchases Defendant required they make for Defendant's benefit and without compensation or reimbursement, and such other legal and equitable relief due to Defendant's unlawful and willful conduct, as the Court deems just and proper.

327.    Plaintiffs and the Wage Deduction Class seek recovery of liquidated damages, interest, attorneys' fees, and costs to be paid by Defendant, as provided by the NYLL.

### SEVENTH CAUSE OF ACTION
### (NYSHRL – Sex Discrimination)
### As to Plaintiff Melissa Wolfe

328.    Plaintiff Melissa Wolfe realleges and incorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

329.    As a woman, Plaintiff Melissa Wolfe is a member of classes protected by New York State Executive Law § 296(1)(a) ("NYSHRL").

330.    Defendant discriminated against Plaintiff Melissa Wolfe on the basis of sex, in violation of NYSHRL, including, but not limited to creating and maintaining a sex-based hostile work environment, and by failing and refusing to take appropriate remedial action in response to Plaintiff's numerous reports of sexual harassment.

331.    By failing and refusing to take appropriate remedial action, Defendant ratified and condoned the perpetrator's behavior, effectively giving him permission to continue.

332.    As a result of Defendant's unlawful discriminatory actions, Plaintiff Melissa Wolfe has suffered lost wages, emotional distress, and other compensatory damages.

333.    As a consequence of its actions, Defendant is liable to Plaintiff Melissa Wolfe for back pay, front pay, emotional distress, and other compensatory damages, costs, and disbursements in this action.

### EIGHTH CAUSE OF ACTION
### (NYSHRL – Disability Discrimination)
### As to Plaintiff Melissa Wolfe

334.    Plaintiff Melissa Wolfe realleges and incorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

335.    At all times relevant, Plaintiff Melissa Wolfe was disabled within the meaning of the NYSHRL because she suffered from a physical and medical impairment resulting from being diagnosed with breast cancer, an anatomical and/or physiological condition which prevents the exercise of the normal bodily function of normal cell growth, caring for oneself, concentration, and sleeping, and is demonstrable by medically accepted clinical and/or laboratory diagnostic techniques.

336.    In spite of her disability, Plaintiff Melissa Wolfe was fully capable of performing the essential functions of her job as an instructor with/without a reasonable accommodation.

337.    Defendant discriminated against Plaintiff Melissa Wolfe, *inter alia,* by failing to treat her medical information as a confidential record and by disclosing such information to persons with no lawful privilege to receive such information, and by removing Defendant from her classes after she requested a reasonable accommodation.

338.    The effect of the practices complained of herein has been to deprive Plaintiff Melissa Wolfe of equal employment opportunities and otherwise to limit, segregate or classify her because of her disability and/or her record of such disability, and/or because Defendant regarded her as disabled.

339.    The unlawful employment practices complained of herein were and are malicious, intentional and in reckless disregard of Plaintiff's health and well-being.  As a result of Defendant's acts, Plaintiff Melissa Wolfe has suffered grievous, extensive and continuing damages, including but not limited to pain and suffering, humiliation, emotional distress, lost wages and benefits, punitive damages and attorneys' fees.

### NINTH CAUSE OF ACTION
### (NYSHRL – Retaliation)
### As to Plaintiff Melissa Wolfe

340.    Plaintiff Melissa Wolfe realleges and incorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

341.    Defendant retaliated against Plaintiff Melissa Wolfe in violation of the NYSHRL, including, but not limited to, the following:

a.  Placing menacing phone calls and texts from Ms. Wolfe's harasser, Jesse Alexander, immediately after making a report of sexual harassment against him.

b.  Regularly scheduling Ms. Wolfe one class per week immediately after making a report of sexual harassment, while other instructors were regularly scheduled multiple times per week;

c.  Scheduling Ms. Wolfe's classes right before or right after her harasser, Alexander, which allowed him an opportunity to further retaliate by bad-mouthing her and her classes to customers, and harass her in passing.

d.  Refusing to schedule Ms. Wolfe for more classes, despite offering other instructors additional classes.

e.  Issuing Ms. Wolfe a sham 2013 performance review.

    f.   Threatening to terminate Ms. Wolfe if she did not assent to continue to be scheduled for classes immediately before or after her harasser, Alexander.

    g.   Regularly scheduling Ms. Wolfe seven days per week, for several months, including the first morning shift, and the last evening shift three to four times per week, after reporting Alexander's harassing conduct and Devine-Baum's retaliatory conduct to Zukerman.

    h.   Removing Ms. Wolfe from her schedule after reporting Alexander's and Devine-Baum's retaliatory conduct to Human Resources.

    i.   Denying Ms. Wolfe multiple requests for time off, including a regularly schedule day off each week, during a grueling seven-day-per-week schedule that spanned several months, while other instructors were granted regular days off each week.

    j.   Revealing Ms. Wolfe's confidential and highly sensitive medical information to other employees who had no legitimate business need for such information.

    k.   Ridiculing and mocking Ms. Wolfe for requesting leave to care for her breast cancer, and insisting that she share her confidential and highly sensitive medical information with others.

    l.   Removing Ms. Wolfe again from her schedule shortly after requesting time off to care for her breast cancer.

    m.  Terminating Plaintiff.

342.    The unlawful employment practices complained of herein were and are malicious, intentional and in reckless disregard of Plaintiff's health and well-being.  As a result of Defendant's acts, Plaintiff Melissa Wolfe has suffered grievous, extensive and continuing damages, including but not limited to pain and suffering, humiliation, emotional distress, lost wages and benefits, punitive damages and attorneys' fees.

### TENTH CAUSE OF ACTION
### (NYCHRL – Sex Discrimination)
### As to Plaintiff Melissa Wolfe

343.    Plaintiff Melissa Wolfe realleges and incorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

344.    By the aforementioned acts, Defendant, through its managerial employees and

agents, discriminated against Plaintiff on the basis of her sex in the terms and conditions of

her employment, and engaged in a pattern of pervasive and/or severe sexual harassment in

violation of §8-107 of the New York City Human Rights Law, as amended by the

Restoration Act ("NYCHRL").

345.    Defendant's actions and the actions of their managerial employees and agents, had

the purpose and/or effect of creating an intimidating, hostile or offensive working

environment which would reasonably be perceived, and was perceived by Plaintiff Melissa

Wolfe, as hostile or abuse.

346.    Defendant condoned and/or ratified the discriminatory conduct, and/or failed to take

remedial action in violation of the NYCHRL.

347.    As a result of the discriminatory and/or retaliatory acts of the Defendant and its

agents, Plaintiff Melissa Wolfe has suffered and will continue to suffer irreparable injury,

economic harm, physical injury, emotional distress, and other compensable damages unless

and until this Court grants relief pursuant to the NYCHRL.

### ELEVENTH CAUSE OF ACTION
**(NYCHRL – Disability Discrimination)**
**As to Plaintiff Melissa Wolfe**

348.    Plaintiff Melissa Wolfe realleges and incorporates by reference each allegation in the

foregoing paragraphs as though fully set forth herein.

349.    At all times relevant, Plaintiff Melissa Wolfe was disabled within the meaning of the

NYCHRL because she suffered from a physical and medical impairment resulting from

being diagnosed with breast cancer, an anatomical and/or physiological condition which

prevents the exercise of the normal bodily function of normal cell growth, caring for oneself,

concentration, and sleeping, and is demonstrable by medically accepted clinical and/or laboratory diagnostic techniques.

350.     In spite of her disability, Plaintiff Melissa Wolfe was fully capable of performing the essential functions of her job as a Flywheel class instructor with/without a reasonable accommodation.

351.     Defendant discriminated against Plaintiff by, *inter alia,* failing to treat her medical information as a confidential record and by disclosing such information to persons with no lawful privilege to receive such information, and by removing Defendant from her schedule after she requested a reasonable accommodation.

352.     The effect of the practices complained of herein has been to deprive Plaintiff of equal employment opportunities and otherwise to limit, segregate or classify her because of her disability and/or her record of such disability, and/or because Defendant regarded her as disabled.

353.     The unlawful employment practices complained of herein were and are malicious, intentional and in reckless disregard of Plaintiff's health and well-being.  As a result of Defendant's acts, Plaintiff Melissa Wolfe has suffered grievous, extensive and continuing damages, including but not limited to pain and suffering, humiliation, emotional distress, lost wages and benefits, punitive damages and attorneys' fees.

**TWELFTH CAUSE OF ACTION**
**(NYCHRL – Retaliation)**
**As to Plaintiff Melissa Wolfe**

354.     Plaintiff Melissa Wolfe realleges and incorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

355.     Defendant retaliated against Plaintiff in violation of the NYCHRL, including, but not limited to, the following:

a.  Placing menacing phone calls and texts from Ms. Wolfe's harasser, Jesse Alexander, immediately after making a report of sexual harassment against him.

b.  Regularly scheduling Ms. Wolfe one class per week immediately after making a report of sexual harassment, while other instructors were regularly scheduled multiple times per week;

c.  Scheduling Ms. Wolfe's classes right before or right after her harasser, Alexander, which allowed him an opportunity to further retaliate by bad-mouthing her and her classes to customers, and harass her in passing.

d.  Refusing to schedule Ms. Wolfe for more classes, despite offering other instructors additional classes.

e.  Issuing Ms. Wolfe a sham 2013 performance review.

f.  Threatening to terminate Ms. Wolfe if she did not assent to continue to be scheduled for classes immediately before or after her harasser, Alexander.

g.  Regularly scheduling Ms. Wolfe seven days per week, for several months, including the first morning shift, and the last evening shift three to four times per week, after reporting Alexander's harassing conduct and Devine-Baum's retaliatory conduct to Zukerman.

h.  Removing Ms. Wolfe from her schedule after reporting Alexander's and Devine-Baum's retaliatory conduct to Human Resources.

i.  Denying Ms. Wolfe multiple requests for time off, including a regularly schedule day off each week, during a grueling seven-day-per-week schedule that spanned several months, while other instructors were granted regular days off each week.

j.  Revealing Ms. Wolfe's confidential and highly sensitive medical information to other employees who had no legitimate business need for such information.

k.  Ridiculing and mocking Ms. Wolfe for requesting leave to care for her breast cancer, and insisting that she share her confidential and highly sensitive medical information with others.

l.  Removing Ms. Wolfe again from her schedule shortly after requesting time off to care for her breast cancer.

m.  Terminating Plaintiff.

356.  The unlawful employment practices complained of herein were and are malicious, intentional and in reckless disregard of Plaintiff's health and well-being.  As a result of Defendant' acts, Plaintiff Melissa Wolfe has suffered grievous, extensive and continuing

damages, including but not limited to pain and suffering, humiliation, emotional distress, lost wages and benefits, punitive damages and attorneys' fees.

## THIRTEENTH CAUSE OF ACTION
### (FMLA – Unlawful Disclosure of Medical Information)
### As to Plaintiff Melissa Wolfe

357.   Plaintiff Melissa Wolfe realleges and incorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

358.   At all times relevant, Plaintiff Melissa Wolfe was "eligible" under the definition of the Family Medical Leave Act ("FMLA") and was entitled to take unpaid leave.

359.   Plaintiff gave notice to Defendant that she intended to take leave for a serious medical condition.

360.   Defendant discriminated against Plaintiff by, *inter alia,* failing to treat her medical information as a confidential record and by disclosing such information to persons with no lawful privilege to receive such information in violation of 29 C.F.R. § 825.500(g).

361.   Defendant's actions were intentional and in reckless disregard of the health and well being of the Plaintiff.  As a result of these acts, the Plaintiff Melissa Wolfe has suffered grievous, extensive and continuing damages, including, but not limited to, lost wages and benefits, liquidated damages, attorney's fees and the costs of this action.

## FOURTEENTH CAUSE OF ACTION
### (FMLA – Willfulness)
### As to Plaintiff Melissa Wolfe

362.   Plaintiff Melissa Wolfe realleges and incorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

363.   Defendant's acts complained of herein with regard to the FMLA were willful.

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, seeks the following relief:

a. That, at the earliest possible time, Plaintiffs be allowed to give notice of this action, or that the Court issue such notice, to all persons who are presently, or have at any time during the three years immediately preceding the filing of this suit, up through and including the date of this Court's issuance of court-supervised notice, were employed by Defendant as instructors.  Such notice shall inform them that this civil action has been filed, of the nature of the action, and of their right to join this lawsuit if they believe they were denied proper wages;

b. Certification of this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

c. Designation of Plaintiffs as representative of the Rule 23 Class, and counsel of record as Class Counsel;

d. Back wages, including unpaid minimum wages and overtime pursuant to the FLSA and the supporting United States Department of Labor regulations;

e. Back wages, including unpaid minimum wages and overtime, pursuant to the NYLL;

f. Liquidated damages relating to back wages, as provided for by FLSA § 216(b) and NYLL § 215(d);

g. Liquidated damage pursuant to the NYLL;

h. Pre-judgment interest and post-judgment interest as provided by law;

i. Damages of $50 for Plaintiffs and the Wage Notice Class for each workweek between April 9, 2011 through February 26, 2015 that Defendant failed to provide

Plaintiffs and the Wage Notice Class with a wage notice, or a total of $2,500, as provided for by N.Y. Lab. Law § 198;

j.  Damages of $50 for Plaintiffs and the Wage Notice Class for each workweek between February 26, 2015 through the present that Defendant failed to provide Plaintiffs and the Wage Notice Class with a wage notice, or a total of $5,000, as provided for by N.Y. Lab. Law § 198;

k.  Damages of $100 for Plaintiffs and the Wage Statement Class for each workweek between April 9, 2011 through February 26, 2015 that Defendant failed to provide Plaintiffs and the Wage Statement Class with accurate wage statements, or a total of $2,500, as provided for by N.Y. Lab. Law § 198;

l.  Damages of $250 for Plaintiffs and the Wage Statement Class for each workweek between February 26, 2015 through the present that Defendant failed to provide Plaintiffs and the Wage Statement Class with accurate wage statements, or a total of $5,000, as provided for by N.Y. Lab. Law § 198;

m.  Issuance of a declaratory judgment that the practices complained of in this action are unlawful under N.Y. Lab. Law § 190 *et seq.*;

n.  Attorneys' fees and costs of the action; and

o.  For other such relief as this Court deems to be just and equitable.

**WHEREFORE**, Plaintiff Melissa Wolfe, on behalf of herself, seeks the following relief:

a.  An order declaring that the acts and practices complained of herein are in violation of the New York State Human Rights Law;

b.  An order declaring that the acts and practices complained of herein are in violation of the New York City Human Rights Law;

c. An order enjoining and permanently restraining these violations of the New York State Human Rights Law;

d. An order enjoining and permanently restraining these violations of the New York City Human Rights Law;

e. An order declaring that the acts and practices complained of herein are in violation of the Family Medical Leave Act;

f. An order enjoining and permanently restraining these violations of the Family Medical Leave Act;

g. back pay, front pay, and other benefits of employment, including applicable medical and retirement benefits;

h. compensatory damages for emotional distress;

i. punitive damages;

j. interest;

k. attorneys' fees, costs and disbursements; and

l. For other such relief as this Court deems to be just and equitable.


Dated:     New York, New York

           August 17, 2016


                              Respectfully submitted,

                              **LISZKA & GRAY, LLC**

                              s/ Zachary J. Liszka_____
                              Zachary J. Liszka, Esq. (ZL8359)
                              Sam Gray, Esq.
                              Carl J. Mayer, Esq*., of Counsel*
                              1180 Avenue of the Americas
                              Suite 800
                              New York, New York 10036
                              347-762-5131
                              zachliszka@gmail.com

*Attorneys for Plaintiffs and the
Putative FLSA Collective and
New York Class*

**Exhibit A**

## <u>CONSENT FORM</u>

1.  I consent to make a claim under the Fair Labor Standards Act, 29 U.S.C. § 201, et seq.

    against my former employer, Flywheel Sports, Inc.  to secure any relief that may be

    awarded, including overtime pay, liquidated damages, attorneys' fees, costs and other

    relief arising out of my employment with Flywheel Sports, Inc.

2.  During the past three years, there were occasions when I was not paid for all hours I

    worked for Flywheel Sports, Inc.

3.  I authorize the law firm Liszka and Gray to represent me in this case.


Date:  __8/2/2016__          _____

                                         Melissa Wolfe

**Exhibit B**

**DECLARATION OF RHISA PARERA**

Declaration of Rhisa Parera, pursuant to 28 U.S.C. § 1746, under penalty of perjury:

1. I am over the age of eighteen, suffer no legal disabilities, have personal knowledge of the facts set forth below, and am competent to testify. I understand I am making the statements in this Declaration under oath. This Declaration is true and accurate to the best of my knowledge.

2. I am an African-American female.

3. I am presently employed by Flywheel Sports, Inc. (herein "Flywheel"), in the position of Front Desk Coordinator in New York City.

4. I started my employment with Flywheel on or about April 2013.

5. I enjoy my job and I wish to keep my job at Flywheel.

6. I know of Melissa Wolfe ("Wolfe"), who was hired as a Flywheel class instructor.

7. I know of Jesse Alexander ("Alexander"), who was a Flywheel class instructor and trained other instructors.

8. Starting on or about November 2013, at work, I witnessed Alexander making derogatory comments about Wolfe, sometimes in her presence, sometimes to Flywheel customers.

9. For example, in November 2013, at the Flatiron Flywheel studio, while working behind the front desk, I witnessed Alexander approaching the door to the class that Wolfe had just finished teaching, saying to two other female customers, " I don't know why these women would take this bitch's class," referring to Wolfe's class that was just ending.

10. I witnessed Alexander make this type of derogatory comment about Wolfe or Wolfe's class to others, or to Wolfe herself after nearly every class Wolfe taught, until he was terminated in July 2015.

11. It was known amongst many co-workers, and I believe, that Alexander held an animosity toward Wolfe for reporting sexual harassment against him, and was making these derogatory comments about Wolfe and Wolfe's class in response to her complaints of sexual harassment by him.

12. From when I was hired, to when Alexander was terminated in July 2015, each time Alexander and I would work together, he would come behind the front desk to touch me inappropriately.

13. My co-workers and I often spoke about Alexander's inappropriate touching, but I feared I would lose my job if I reported it, considering, among other things, Alexander's close ties to management, and the favoritism I had witnessed toward those who curried favor with Alexander.

Dated: 7/29/16

Rhisa Parera

Rhisa Parera

**Exhibit C**

**CONSENT FORM**

1. I consent to make a claim under the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. against my former employer, Flywheel Sports, Inc.  to secure any relief that may be awarded, including overtime pay, liquidated damages, attorneys' fees, costs and other relief arising out of my employment with Flywheel Sports, Inc.

2. During the past three years, there were occasions when I was not paid for all hours I worked for Flywheel Sports, Inc., including at the applicable overtime rate.

3. I authorize the law firm Liszka & Gray, LLC to represent me in this case.

Date: 8/14/16

Bryant Montalvo